[S. F. No. 15702. In Bank.—July 26, 1937.]

A. D. ALEXANDER et al., Respondents, v. STATE CAPITAL COMPANY (a Corporation) et al., Defendants; CALIFORNIA MUTUAL BUILDING & LOAN ASSOCIATION (a Corporation) et al., Appellants.

D. T. Jenkins, Walter Carrington and Fred A. Wool for Appellants.

F. W. Sawyer for Respondents.

THE COURT.—This is an appeal from a judgment in favor of those plaintiffs whose claims were not dismissed prior to judgment in an action brought to establish their claims against the California Mutual Building & Loan Association, in process of liquidation, after rejection thereof by the Building & Loan Commissioner, and after a schedule of the rejected claims had been filed in the Superior Court of Santa Clara County.

The claims are all based upon fraud and arise out of the following situation: The State Capital Company was organ-

ized in the early part of 1929 for the purpose of acquiring the guarantee stock of the California Mutual Building & Loan Association and, perhaps, the guarantee stock of other building and loan associations. An option was outstanding by which a great majority of the guarantee stock of the California Mutual Building & Loan Association might be acquired and the State Capital Company, by arrangements which it is not necessary to detail, became entitled to exercise the option. For our purposes, it is sufficient to say that the State Capital stock was divided into preferred and common shares, the preferred being a 7 per cent cumulative preferred and the common stock being entitled to the remainder of the dividends declared. Along in August or September, 1929, the State Capital Company launched a campaign for the purpose of selling its preferred capital stock and, in connection therewith, some of its common stock, the units consisting of one share of preferred and one share of Class ''A'' common, to be sold for the price of $125 a unit. This campaign continued until some time in February, 1931. As a result, the Capital Company became the owners of approximately 90 or 92 per cent of the guarantee stock of the California Mutual Building & Loan Association.

The complaint alleges that the fraud complained of consisted of the sale of the capital stock contrary to the permit of the Corporation Commissioner, and false statements made to the plaintiffs, as investors in the Building & Loan Association, that it was necessary, in order to save such investors, to convert their holdings into capital stock of the Capital Company; that the transaction was of great financial benefit to each plaintiff and that the Capital Company was a mere holding company of the California Mutual Building & Loan Association and was the owner of all the assets and property of the California Mutual Building & Loan Association. The court found in accordance with these allegations, specifically finding that the permit was violated, because there was not exhibited to and left with the subscriber and purchaser a copy thereof. It was also alleged that at all times the California Mutual Building & Loan Association and the State Capital Company were allied and subsidiary corporations and that the conversion of the deposits or investments of the plaintiffs into the capital stock of the Capital Company was accomplished by a mere book entry upon the books of the

corporations. The court also found in accordance with these allegations and also found in accordance with another allegation of the complaint that the plaintiffs were induced by the California Mutual Building & Loan Association to withdraw the amount of their investments from the Building & Loan Association and invest in the capital stock of the Capital Company by means of false representations already mentioned. The principal contentions of the appellants are: that the evidence does not support the findings; that the court erred in admitting evidence which purported to tend to prove agency; that the claimed false representations were not actionable; that the mutual shareholders of the Building & Loan Association were not entitled to have their claims established; and that the claims were barred by section 13.16 of the Building & Loan Act, which provides that action must be started and service had within four months after the schedule of rejected claims is filed with the court.

■ Considering first the question of whether the evidence is sufficient to support the findings, there are at least two representations which were made practically to all of the respondents—perhaps there are two or three instances in which the language was changed but, in almost every instance, it was represented to the respondents that they would be receiving 7 per cent instead of 6 per cent interest, which they were receiving on investment certificates and passbook accounts. Many of the respondents were also given to understand that they would also share in the profits above the 7 per cent, by reason of their ownership of common stock and by reason of the ownership by the Capital Company of the guarantee stock of the Building & Loan Association. It was also almost universally stated that the transaction was a good business transaction and would be a financial benefit to the respondent. In considering whether these representations were false, we must note that, with one exception, all the sales were made subsequent to the crash of October, 1929, and that all of them were made long after the recession of real estate values had set in. It is true that the capital stock structure of the Capital Company called for the payment of 7 per cent dividends on the preferred stock and that the common stock was entitled to share in the net earnings in excess of the amount necessary to pay these dividends, but it is also true that, with an insignificant exception, the total earnings of the

Capital Company were to be received by way of dividends upon the guarantee stock of the Building & Loan Association owned by it. As an indication of what effect the recession in real estate values had upon the earnings of the Building & Loan Association is the fact that during 1930 the Building & Loan Association paid no dividends upon its guarantee stock, although it may be added parenthetically that the Capital Company paid two dividends in that year, the source of which must have been the capital paid in by the stockholders. The question may be reduced to this: Assuming that the Building & Loan Association was a party to the representations made by the agents, was it an actionable representation to state that it would be a good thing and a financial benefit to those persons who had funds, ordinarily withdrawable and bearing 6 per cent interest, to convert such funds into capital stock of a corporation holding its guarantee stock? Undoubtedly, with the lessening of the value of real estate, the Building & Loan Association was having difficulty in lending its funds and was finding its mortgage securities somewhat in danger. We are compelled to hold, in view of the absolute knowledge of the Building & Loan Association, contrary to the statements made and in view of the confidence of the respondents in the association hereafter mentioned, that a representation to the effect stated, under the circumstances, was a false actionable representation. In other words, under the circumstances here involved, the representations amounted to "the suggestion, as a fact, of that which is not true, by one who does not believe it to be true" within the meaning of subdivision 1 of section 1572 of the Civil Code defining actual fraud.

We have assumed, in answering the question stated, that the Building & Loan Association was a participant in the statements made by the agents in selling the stock of the Capital Company. There can be no question, from the record in this case, that the agents represented that they were approaching the respondents herein as representatives of both the Building & Loan Association and the Capital Company. It must be granted that such representation on the part of the agents would not be binding upon the Building & Loan Association, but a considerable number of the respondents, before purchasing, discussed the transaction with various officers of the Building & Loan Association and were advised by them

that the proposed transaction was a good thing and, in some instances, the statement was made that the person making the approach was the agent.

We have read the entire record and are satisfied that the finding of the court to the effect that the Building & Loan Association was acting through these agents and was a participant in the representations is supported therein. Not only is this conclusion reached from the evidence recited, but there is also considerable evidence concerning the benefit which accrued to the Building & Loan Association as a result of such transfers. ■ We entertain no doubt of our right to take judicial notice of the depression and the declining real estate values. (*Nev.-Cal. Elec. Securities Co.* v. *Imperial Irr. Dist.*, 85 Fed. (2d) 886; *Camerer* v. *California Savings & Commercial Bank, San Diego*, 4 Cal. (2d) 159 [48 Pac. (2d) 39, 100 A. L. R. 667]; *Antognini* v. *Grandi Co.*, 89 Cal. App. 628 [265 Pac. 378]; *In re Fehlmann's Estate*, 134 Or. 33 [292 Pac. 1029, 72 A. L. R. 949]; *McGuigan* v. *Heuer*, 66 N. D. 710 [268 N. W. 679]; *Findlay* v. *Florida East Coast Ry. Co.*, 3 Fed. Supp. 393; *Burns Mortgage Co.* v. *Bond Realty Corp.*, 47 Fed. (2d) 985; *Coral Gables, Inc.*, v. *Patterson*, 231 Ala. 649 [166 So. 40]; *Gryzmish* v. *Krim*, 126 Fla. 191 [170 So. 717].)

With a receding real estate market and an accompanying reluctance to make loans, it was obviously a benefit to the Building & Loan Association to change interest bearing deposits from its liability column into capital stock of its holding corporation. Also, three of the directors of the Building & Loan Association were directors of the Capital Company and, in at least one letter written by the Building & Loan Association, reference was made to the Capital Company as "our State Capital Company" and, in another letter, sent to the stockholders of the State Capital Company, the California Mutual Building & Loan Association said, "and the officers of your Association". It is true that these letters were written in the middle of 1931 and after the selling campaign had been concluded, but the fact remains that they indicate very clearly the recognized alliance between the two companies. These are some of the things which appear in the record and induce us to believe, as already announced, that the finding that the Building & Loan Association was a

participant in the representations is supported by the evidence.

■ The complaint alleged and the court found that the respondents relied upon the representations which we have been discussing and which we have concluded were actionable. The appellants contend that this finding is unsupported. The respondents testified that they relied upon the representations, which is the situation in practically every instance, or they testified that they were induced to convert their investments by the representations. Under the situation here existing, the finding is supported by the testimony. It is true that the Building & Loan Association did not occupy any of the conventional or statutory relations which are declared to be fiduciary, but, nevertheless, there was evidence of the previous business relations of each respondent with the association and of confidence on the part of the respondent in the association and its officers. In this respect, the case is not unlike that of *Bank of America* v. *Sanchez,* 3 Cal. App. (2d) 238 [38 Pac. (2d) 787], and strongly tends to confirm other testimony of reliance upon the representations.

■ What we have already said concerning the testimony with respect to agency practically disposes of the contention of appellants that evidence was erroneously received. It cannot be gainsaid that testimony to establish the statements made by the agents that they were representing the Building & Loan Association, together with the name of the agent, in the absence of evidence directly establishing the fact that the Building & Loan Association was a participant, would have been hearsay and improperly admitted. The record indicates that the trial judge fully understood this situation and stated that the evidence was received with the understanding that it was necessary to connect it up by other proof which, as we have already indicated, was done. It is manifest, therefore, that no prejudicial error was committed by the trial judge in this particular.

■ In passing for the time being the claim that the mutual shareholders were not entitled to have their claims established, we may consider the contention that the action was barred by the failure on the part of the plaintiffs to serve the summons within four months after the schedule of rejected claims was filed. The contention is based upon the fact that the complaint and summons were not served upon the com-

missioner personally but within the statutory time were served upon the liquidating deputy appointed by the Building and Loan Commissioner, pursuant to the provisions of section 13.16 of the Building & Loan Act (Deering's Gen. Laws, 1931, pp. 459, 509), which authorizes the commissioner to appoint one or more special deputies to assist in the duties of liquidation and distribution, and on the fact that the same section of the act provides as follows:

"Action to enforce the payment of or to establish any rejected claim must be brought and service had within four months from and after the date of filing of the schedule of claims with the proper court; otherwise all such actions shall be forever barred."

However, it seems to be conceded by the appellants that the deputy upon whom the process was served was the deputy in actual charge of the California Mutual Building & Loan Association, under which circumstances, we are of the opinion that the service must be upheld.

Another portion of section 13.16 provides as follows:

"For the purpose of executing and performing any of the powers and duties hereby conferred upon him, the commissioner may in the name of such association or in his own name prosecute and defend any and all suits and other legal proceedings . . ."

Our attention has not been directed to any section of the act which provides that service shall be made upon the commissioner, and we have discovered none. The commissioner, of course, is not sued as the commissioner, but appears solely as the liquidating officer of the association. Service must be governed by the general law.

Section 411 of the Code of Civil Procedure provides that service against a domestic corporation may be made upon the general manager. Under the state of facts which we have recited, the liquidating deputy commissioner was in truth the general manager of the corporation during the period of liquidation. The corporation was not dissolved, nor was its charter forfeited, hence the service upon the deputy in charge thereof was a compliance with the requirements of the general law.

It is also asserted by appellant that the court erred in finding that the claims of fraud were not barred by laches. In this particular the record discloses that the regular divi-

dend of 7 per cent was declared to the stockholders of the Capital Company on January 15, 1931, and that the first dividend which was passed would ordinarily have been declared in July, 1931. The Building & Loan Commissioner took charge January 9, 1933. All of the testimony introduced upon the subject indicates that the respondents did not discover that the representations were not to be relied upon until after the dividend was passed in July, 1931, when several of them tried to get their money returned to them. The most that can be said for the claim that the respondents are barred by laches is that there was a delay of less than 18 months in the bringing of the action. The element of time is but one of the factors in determining whether laches is to bar the action. Another element is that of injury occurring to the wrongdoer by reason of the delay. In *Chamberlain* v. *Chamberlain,* 7 Cal. App. 634, 641 [95 Pac. 659], is quoted a statement of Pomeroy as follows:

" 'The acquiescence must be with knowledge of the wrongful acts themselves and of their injurious consequences; it must be voluntary, not the result of accident, nor of causes rendering it a physical, legal or moral necessity, and it must last for an unreasonable length of time, so that it will be inequitable even to the wrongdoer to enforce the peculiar remedies of equity against him, after he has been suffered to go on unmolested and his conduct apparently acquiesced in,' and he adds that 'It follows that what will amount to a sufficient acquiescence in any particular case must largely depend upon its own special circumstances.' "

There is no suggestion in the record in this case that the lapse of time resulted in any injury to the Building & Loan Association, nor has it been made to appear that by reason of lapse of time it is inequitable to enforce the demands of the respondents.

■ The last contention is to the effect that the court erred in establishing the claims of those who were formerly mutual shareholders, and to a degree we must agree with appellants in this particular. Prior to 1931, building and loan associations were authorized by section 648a of the Civil Code to organize with or without guarantee or other capital stock. "If formed without any capital stock or with guarantee capital stock only, the working capital may be accu-

mulated by the issue of membership shares, units or certificates having a paid up or ultimate matured instalment value of $100 or $200 each and entitled to all the rights, powers and privileges and subject to all the restrictions and liabilities provided in this title for shares of authorized capital stock of a similar class.'' Prior to 1924, California Mutual Building & Loan Association had no guarantee capital stock or other capital stock. Its working capital was accumulated in the manner just described and shares representing such capital were described as mutual shares. In *Groover* v. *Pacific Coast Sav. Soc.*, 164 Cal. 67 [127 Pac. 495, Ann. Cas. 1914B, 1261, 43 L. R. A. (N. S.) 874], it was held that such members or shareholders were bound to contribute to the losses of the common enterprise, and that the relation of such a member is that of a stockholder. The finding, however, groups the respondents who were mutual shareholders into a class by themselves and then says it ''would be inequitable to restore to said plaintiffs said shares at this time'', for which reason the judgment establishes their claims in the cash value of the shares at the time the shares were transferred into capital stock of the Capital Company. Undoubtedly these mutual shareholders were entitled to have their claims approved, but we find nothing in the record which supports the finding of the trial court that it would be inequitable to restore them to the status of mutual shareholders. Under the decision cited, they are liable for their proportionate share of the losses of the enterprise and were not entitled after rescission of their contract to stand in any class preferred above other mutual shareholders. The judgment should be modified to show that the claims of these mutual shareholders, to-wit, A. D. Alexander, Edward K. Park, Alletta Tate and Joseph K. Tate, J. W. Withrow and Etta S. Withrow, C. C. Stiffler, C. W. Spalding and Nellie B. Spalding, Herbert H. Oberlie, M. A. Ross and Dora E. Ross, Harry E. Cushing and Mae E. Totman, are claims based upon mutual shares and not upon investment certificates or passbook deposits.

It is asserted, however, that in two instances, to-wit, with respect to the respondents Kate P. Wylie and Edith Oaks Mathieson, the court erred in finding that they were depositors instead of mutual shareholders. So far as the

respondent Wylie is concerned, a reading of the record fails to disclose whether she exchanged deposit certificates, mutual shares, or paid cash for shares of the Capital Company. Under such circumstances, the judgment as to her must be reversed, being unsupported by the record. And with respect to the respondent Edith Oaks Mathieson, a reading of the record shows that $250 invested by her was from a passbook deposit, and $2,000 was drawn by her in cash from some other institution, and the court approved her claim only in the sum of $250. Therefore, we should not disturb the judgment with respect to her. It is also asserted that certain other findings with respect to individuals are unsupported. The record does not bear out the contention. Wherever the individual was both a mutual shareholder and a depositor, the court so found, and fixed the amount of their respective claims.

It is, therefore, ordered that the judgment be affirmed as to all respondents except those whose claims are found to have been based on mutual shares, and that as to those respondents whose claims are based upon mutual shares the judgment is reversed with instructions to the trial court to amend its findings and conclusions of law in conformity with the opinion herein, and to enter judgment in favor of such respondents, establishing their claims as shareholders with no priority over other mutual shareholders, and as to respondent Wylie, the judgment appealed from is reversed.

Rehearing denied.