[L. A. No. 19533. In Bank. Oct. 31, 1946.]

THE PEOPLE, Respondent, v. FRED Y. OYAMA, a Minor, etc., et al., Appellants.

Wirin, Maeno & Tietz, A. L. Wirin and Saburo Kido and Fred Okrand for Appellants.

Daniel G. Marshall, Sherwood Green, Marlin H. Shirley, Wayne M. Collins, Arthur Garfield Hays, Oswald K. Fraenkel, James C. Purcell and William E. Ferriter as Amici Curiae on behalf of Appellants.

Robert W. Kenny, Attorney General, Everett W. Mattoon, Deputy Attorney General, Thomas Whelan, District Attorney (San Diego), and Duane J. Carnes, Deputy District Attorney, for Respondent.

Chester E. Watson, District Attorney (San Joaquin), and Robert P. Sullivan, Chief Deputy District Attorney as Amici Curiae on behalf of Respondent.

EDMONDS, J.—Principally upon the ground that the United States Supreme Court has changed the constitutional tests applicable to state legislation such as the Alien Land Law (Alien Property Initiative Act of 1920, Stats. 1921, p. lxxxiii, as amended; 1 Deering's Gen. Laws, Act 261), the validity of that statute is again challenged. Another question presented for decision concerns the effect of the recent amendment of the federal law which allows, under certain circumstances, a member of the Japanese race to become a citizen of the United States.

In the petition filed by the attorney general, he asserted that certain real property, by reason of its conveyance in violation of the Alien Land Law, has escheated to the state. Two causes of action were pleaded. In the first one, it was alleged that Kajiro Oyama, Kohide Oyama, formerly Kohide Kushino, and Ririchi Kushino, are of the Japanese race, natives of the Empire of Japan and citizens and subjects of that country and, by reason thereof, are not eligible to citizenship under the laws of the United States; that Fred Y. Oyama is the son of Kajiro and Kohide Oyama and is of the Japanese race but was born in California in 1928; and that June Kushino also is of the Japanese race and was born in California in 1921. There has never been a treaty permitting a native of Japan to acquire an interest in the agricultural land of this country. Since 1935, by appointment of the Superior Court of the State of California, in and for the County of San Diego, Kajiro Oyama has been the duly qualified guardian of the person and estate of Fred Y. Oyama, a minor. June Kushino attained the age of 21 years in 1942 and during her minority, Ririchi Kushino was the guardian of her person and estate.

In 1934, the petition continued, Kajiro Oyama and Kohide Oyama purchased certain agricultural land in San Diego County and a purported conveyance of it was made by one

Yonezo Oyama to Fred Y. Oyama. The purchase price of $4,000 was paid to Yonezo Oyama by Kajiro and Kohide Oyama. Upon the execution and delivery of this purported deed, Kajiro and Kohide Oyama entered into the possession of the property and have ever since occupied and cultivated it as their own, and have had in their own right the beneficial use and enjoyment of the lands for agricultural purposes. The purchase of the property and the taking of the deed in the name of Fred Y. Oyama was a mere subterfuge, a fraud upon the People of the State of California and a violation of the Alien Land Law of California. Moreover, these persons acted willfully, knowingly and with intent to obtain the ownership and use of the agricultural lands for their own use.

Other allegations of this count were that Kajiro Oyama failed to render any account to the superior court for his receipts and expenditures as guardian, and has not filed any annual or other account or report with the Secretary of State of Californa, as required by section 5 of the Alien Land Law. No account or report has been filed by the guardian with the County Clerk of San Diego County or served upon the district attorney, but in conducting business affecting the land in controversy, Kajiro Oyama used the name "Fred Oyama" and "Y. Oyama," and maintained checking accounts in each of those names for the purpose of evading and violating the Alien Land Law.

The second cause of action incorporated some of the allegations of the first count, including those having to do with the race, nativity, citizenship and status of the parties. It then pleaded that in 1937, the Superior Court of the State of California, in and for the County of San Diego, in the matter of the Guardianship of June Kushino, made an order confirming the sale of certain described land in that county from her to Fred Y. Oyama for a purchase price of $1,500. Upon the making and recording of that order, Kajiro and Kohide Oyama entered into possession of the property and have since occupied and used it as their own and have had in their own right the beneficial use of the land for agricultural purposes. All of these acts were done by Kajiro and Kohide Oyama, willfully, knowingly and with intent to violate the Alien Land Law of the State of California. The prayer of the petition was that the land conveyed to Fred Y. Oyama be decreed to have escheated to the state as of the date of the

respective deeds; also that, as against the state, each of the defendants be forever barred from asserting any claim or title to either parcel.

The defendants demurred to the petition upon the grounds that it did not state facts sufficient to state a cause of action, that the court lacked jurisdiction, that the California Alien Land Law is unconstitutional, and that the causes of action are barred by the statutes of limitations. The demurrer was overruled.

By answer, the defendants admitted the race and Japanese citizenship of Kajiro Oyama, Kohide Oyama, and Ririchi Kushino, but denied that, by reason thereof, they are not eligible to citizenship under the laws of the United States. They admitted the pleaded facts as to the birth and race of Fred Y. Oyama and June Kushino, and also the allegations concerning the guardianship proceedings. But the answer denied that Kajiro and Kohide Oyama purchased the property described in the complaint and asserted that Kajiro Oyama provided the money to purchase the two parcels of property as a gift to his son. Each of the transactions was made in good faith and for the purpose of acquiring for their son a means of earning a livelihood and for the further purpose of guarding and husbanding the gift for that purpose. The property described in the complaint is agricultural land, but Kajiro and Kohide Oyama have not occupied, used or cultivated it as their own nor had the beneficial use of it. As an affirmative defense, the defendants alleged that the state should not recover because of laches.

Upon the trial of these issues, John C. Kurfurst was the only witness. He testified that he had known the Oyama and Kushino families since about 1932. When the Japanese were evacuated from the Pacific coast, he rented the land in controversy and, by two checks, paid the rent to Fred Oyama. These checks were returned to him endorsed in that name. Kurfurst had never heard the name Kajiro Oyama; he had always known the father of the family as ''Fred'' and stated that ''everybody else called him Fred.'' But he had received a letter signed ''Fred Oyama'' notifying him that the property was being turned over to a Mr. Kelly although Kurfurst had never heard the writer refer to himself by that name.

Other testimony of Kurfurst was that at one time Oyama, senior, said: ''Some day the boy will have a good piece of property because that is going to be valuable.'' However, he

admitted that in a letter which he wrote, in referring to "Fred Yoshihiro Oyama," he meant the son and not the father. He knew that the property belonged to the boy, Fred Oyama, and to June Kushino; also that the father was running the boy's business. But he did not know whether the checks were made out to the "old man or the young fellow" and he did not know "whether the boy signed it or Mr. Oyama."

Evidence of official records showed that no reports pursuant to the requirements of the Alien Land Law had been filed by the defendants. The state also proved that in the guardianship proceeding, on two occasions, the father of Fred Y. Oyama, as guardian, applied for leave of court to borrow money and to mortgage the property as security for the indebtedness. Both applications were granted.

Upon this evidence the court found all of the facts alleged in the petition to be true. The conclusions of law drawn from these facts were that, as of 1934 and 1937, respectively, title to the two parcels of real property in question was vested in and did escheat to the State of California and the defendants were perpetually enjoined from setting up or making any claim to the land. The appeal is from that judgment.

The defendants contend that the Alien Land Law is unconstitutional because enacted for the purpose of and administered in a manner to discriminate against persons solely because of race. It is urged that as to both Kajiro Oyama, an alien, and Fred Oyama, a citizen, the statute denies due process of law as guaranteed by article I, section 13, of the California Constitution, and violates article I, section 1, of the same Constitution which guarantees to all men the right to enjoy life, liberty and property. The point is also urged that the Alien Land Law constitutes an unlawful delegation of legislative power to the federal government, and that the phrase, "ineligible to citizenship" is vague, indefinite and constitutes a denial of due process.

As to Fred Oyama, a citizen, it is argued that the Alien Land Law violates the mandate of the California Constitution that no citizen or class of citizens shall be "granted privileges or immunities which, upon the same terms, shall not be granted to all citizens." (Const., art. I, § 21.) Considering the statute in its application to both Kajiro and Fred Oyama, the defendants continue, it deprives them of property without due process of law and denies them equal protection of the

laws and deprives Fred Oyama of privileges and immunities as a citizen, all in violation of the Fourteenth Amendment to the Constitution of the United States. Counsel also contend that, although the Alien Land Law has been upheld, the United States Supreme Court has changed the constitutional test applicable to state legislation discriminating against a group and its members because of race from the "rational basis" doctrine to that of "clear and present danger." A decision approving a statute does not bar a contrary determination at another time and under a different set of circumstances. Furthermore, by virtue of a recent amendment to the Naturalization Act, persons of Japanese birth no longer are ineligible to citizenship solely because of race, and the Alien Land Law is inapplicable to Kajiro Oyama because, if he joins the Army, he may become a citizen.

The defendants also rely upon the statutes of limitations. As they state the rights of the parties, by section 312 of the Code of Civil Procedure all actions are barred by some statute of limitations and the state's claims are barred by the 1-year, the 3-year, the 4-year and the 10-year statutes of limitations. More specifically, the present suit comes within section 340 of the Code of Civil Procedure. Section 338, subdivision 1 of the same code also is applicable because this is an "action upon a liability created by statute, other than a penalty or forfeiture." Moreover, section 338, subdivision 4, of the Code of Civil Procedure bars the remedy since the effect of the judgment is that the defendants acted fraudulently. Section 343 also applies, and the broad provisions of section 315 of the same code include an escheat action. In conclusion, it is contended that the doctrine of laches is applicable to each cause of action. Two amicus curiae briefs filed on behalf of appellants develop in more detail the principal contentions in regard to the bar of the statutes of limitations.

The attorney general stands upon the decision of this court and that of the United States Supreme Court upholding the constitutionality of the Alien Land Law as a proper exercise of the state's police power. It has been the invariable policy of the United States, he declares, to discriminate against aliens by racial classification for purposes of immigration and naturalization. There is a rational basis for discrimination, and the distinction between eligible and ineligible aliens is made by federal, not state, statutes. Moreover, the test of a "clear and present danger" is limited to fundamental civil liberties

and not to property rights and no evidence was presented establishing unconstitutional discrimination. The recent amendment to the naturalization laws does not abolish ineligibility to citizenship of aliens regardless of race, as the defendants contend, but only extends the privilege of naturalization to those serving honorably in the armed forces during World War II. Furthermore, since title to the property vested in the State of California long prior to the act of Congress attempted to be relied upon by the defendants, the later legislation can have no effect upon the state's title.

In regard to the statutes of limitations, the state contends that section 340 of the Code of Civil Procedure is not applicable to the recovery of real property and there is neither a forfeiture nor the imposition of a penalty under the Alien Land Law. Section 338, subdivision 1, does not apply, because no question of "liability" is involved. Subdivision 4 of the same section deals with actions based upon fraud, which is only an incidental issue in the present suit; the gist of the action is that the state claims to have title to land and the defendants are asserting unfounded claims to it. As to section 343 of the Code of Civil Procedure, the bar of that statute was not raised by the pleadings and it has no application to an escheat proceeding.

Considering section 315 of the Code of Civil Procedure, the attorney general takes the position that although there is no express language in the Alien Land Law which excepts its requirements from the operation of other provisions of law, the plain policy of the enactment is wholly inconsistent with the application of a statute of limitations and the Legislature has so declared in a 1945 amendment to the statute. And because there is no showing of any injury by the delay, the doctrine of laches is not applicable, and the finding upon that issue is beyond the reach of an appellate court. The amicus curiae brief filed upon behalf of the state presents substantially the same arguments as those advanced by the attorney general.

The Alien Land Law legislates concerning the right to own land in this state. The scope of the statute is much broader than the acquisition and ownership of land; it includes the right to "acquire, possess, enjoy, use, cultivate, occupy, transfer, transmit and inherit real property . . . [or to] . . . have in whole or in part the beneficial use thereof." (§§ 1, 2.)

This right is given to citizens of the United States and to all aliens eligible to become such; aliens who are not eligible to citizenship under the laws of the United States can enjoy the right only in the manner and to the extent and for the purposes prescribed by any treaty existing at the time of the enactment of the statute between the government of the United States and the nation or country of which the alien is a citizen or subject. (§§ 1, 2.) Section 4 of the statute, as originally enacted, denied to an alien parent the right to become the guardian of the estate of his native-born child and was held invalid. (*Estate of Yano*, 188 Cal. 645 [206 P. 995].) However, in 1943, the Legislature amended that section, allowing the appointment of an alien guardian but preventing such guardian from enjoying, either directly or indirectly, the beneficial use of land owned by the minor. The new provision requires the guardian to make an annual report to the court showing all moneys expended and received, and to serve a copy of such report upon the district attorney of the county, together with notice of the hearing of the report. Failure to do so renders the guardian punishable by fine, imprisonment, or both.

Section 5 directs the guardian to file in the office of the secretary of state, and in the office of the county clerk of each county in which any property is situated, an annual report describing ''property . . . held by him . . . on behalf of such alien or minor; . . . the date when each item of such property came into his possession or control; An itemized account of all such expenditures, investments, rents, issues and profits in respect to the administration and control of such property 'with particular reference to holdings of corporate stock and leases . . . and other agreements in respect to land and the handling or sale of products thereof.'' Violation of this section is punishable by imprisonment, fine or both.

Section 7 of the statute, as amended in 1923, states that real property acquired in violation of the act by an ineligible alien ''shall escheat as of the date of such acquiring, to, and become and remain the property of the state of California.'' Section 8.5, added in 1945, provides: ''No statute of limitations shall apply or operate as a bar to any escheat action or proceeding now pending or hereafter commenced pursuant to the provisions of this act.'' As a part of the same enactment, the Legislature declared that it ''does not constitute a

change in, but is declaratory of, the preexisting law." (Stats. 1945, ch. 1136.)

By other provisions of the legislation, where the property interest attempted to be transferred is of such character that the ineligible alien "is inhibited from acquiring, possessing, enjoying, using, cultivating, occupying, transferring, transmitting or inheriting it," and if the conveyance is made "with intent to prevent, evade or avoid escheat," the "transfer of real property, or of an interest therein, though colorable in form, shall be void as to the State and the interest thereby conveyed as sought to be conveyed shall escheat to the State as of the date of such transfer." (§ 9.) By the terms of the same section, a prima facie presumption that the conveyance is made with such intent shall arise upon proof of: "(a) The taking of the property in the name of a person other than the persons mentioned in Section two hereof if the consideration is paid or agreed or understood to be paid by an alien mentioned in Section two hereof. . . ."

The determination as to eligibility to citizenship rests exclusively with the federal government and is fixed by Congress in the naturalization laws. Whomever it endows with the right to become a citizen may acquire and own land in California.

Eligibility has been extended to "white persons, persons of African nativity or descent, descendants of races indigenous to the Western Hemisphere, and Chinese persons or persons of Chinese descent" and includes native-born Filipinos having honorable service in our armed forces and former citizens who are otherwise eligible. (57 Stats. 601, 8 U.S.C.A. § 703.) In 1942, the Naturalization Act was amended (56 Stats. 182, 8 U.S.C.A. § 1001) to extend the privilege of naturalization to include "any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war and who shall have been at the time of his enlistment or induction a resident thereof and who (a) was lawfully admitted into the United States, including its Territories and possessions, or (b) having entered the United States . . . prior to September 1, 1943, being unable to establish lawful admission into the United States serves honorably in such forces beyond the continental limits of the United States or has so served. . . ."

174

■ The state has the right to regulate the tenure and disposition of real property within its boundaries. (*Mott* v. *Cline*, 200 Cal. 434 [253 P. 718]; *Blythe* v. *Hinckley*, 127 Cal. 431 [59 P. 787]; *Terrace* v. *Thompson*, 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255]; *United States* v. *Fox*, 94 U.S. 315 [24 L.Ed. 192].) It also has the power, in the absence of a treaty to the contrary, to forbid the taking or holding of property within its limits by aliens (*Mott* v. *Cline, supra,* p. 447; *In re Y. Akado*, 188 Cal. 739, 743 [207 P. 245]; *Blythe* v. *Hinckley, supra,* p. 436; *Terrace* v. *Thompson, supra,* p. 217) and our Constitution leaves to the Legislature this power with regard to all aliens ineligible to citizenship. (Cal. Const., art. I, § 17; *In re Y. Akado, supra,* p. 743.)

The Alien Land Law expressly honors every right vouchsafed by a treaty between this and another nation. In all cases where the right to own land in the United States by citizens of a foreign nation is granted by treaty, such right is recognized and fully protected. (§ 2.) "The treaty between the United States and Japan provides that citizens of Japan residing in the United States may lease land for residential and commercial purposes, but it contains no provision authorizing an alien of the Japanese race to lease or acquire land for agricultural purposes. Consequently the initiative alien law . . . prohibits the acquisition by such alien of any agricultural land situated in this state." (*In re Y. Akado, supra,* p. 740; see, also, *Terrace* v. *Thompson, supra,* p. 223; *Porterfield* v. *Webb*, 263 U.S. 225, 232 [44 S.Ct. 21, 68 L.Ed. 278].) The abrogation of this treaty on January 26, 1940, has no effect upon the rights of the parties in the present litigation.

Shortly after the People enacted the Alien Land Law, a suit was brought to enjoin the attorney general from enforcing its provisions. The plaintiffs complained that they had been "unlawfully coerced by . . . threats of prosecution from entering into . . . agreements [pertaining to the planting, cultivating, and farming of certain agricultural lands] and . . . thereby deprived of their property without due process of law and . . . denied equal protection of the law in contravention to the fourteenth amendment of the federal constitution." It was held that the legislation does not "offend any clause or provision of the state or federal constitution or violate any treaty obligation or right existing between this country and the empire of Japan." As to the

validity of certain cropping contracts, the court said, quoting from *Webb* v. *O'Brien,* 263 U.S. 313 [44 S.Ct. 112, 68 L.Ed. 318]: ''Conceivably, by the use of such contract, the population living on and cultivating the farm lands might come to be made up largely of ineligible aliens. The allegiance of the farmers to the state directly affects its strength and safety. (*Terrace et al.* v. *Thompson, supra.*) We think it within the power of the state to deny to ineligible aliens the privilege so to use agricultural lands within its borders.'' (*Porterfield* v. *Webb,* 195 Cal. 71 [231 P. 554].)

The *Webb* v. *O'Brien* decision, it was pointed out in this case, ''rests largely upon broad principles of national safety and public welfare. Unquestionably the farming of lands by ineligible aliens would give them a use, occupancy, and benefit of agricultural lands which in effect would amount to a deprivation of its use, enjoyment and occupancy by the citizen. Any other theory would be incompatible with the occupation of husbandry. . . . Racial distinctions may furnish legitimate grounds for classifications under some conditions of social or governmental necessities.'' (195 Cal. at p. 82.)

In the case of *Mott* v. *Cline, supra,* the owner-lessor challenged the validity of a certain option provision in a lease, the contention being that the lessee was an ineligible alien. As to the constitutionality of the statute, the court said: ''It has been firmly settled by the decisions of both federal and state courts . . . that the adoption of the Alien Land Acts was a lawful exercise of the police power. In fact, it is the exercise of that power in its highest and truest sense. The ownership of the soil by persons morally bound by obligations of citizenship is vital to the political existence of a state. It directly affects its welfare and safety.'' (200 Cal. at p. 447.)

The status of aliens in connection with the ownership of real property was also considered by the United States Supreme Court in *Terrace* v. *Thompson, supra.* The court there pointed out that ''two classes of aliens inevitably result from the naturalization laws,—those who may and those who may not become citizens. The rule established by Congress on this subject, in and of itself, furnishes a reasonable basis for classification in a state law withholding from aliens the privilege of land ownership as defined in the

act.'' Considering the contention that an alien land law similar to our own enacted by the State of Washington was repugnant to the due process clause and the equal protection clause of the Fourteenth Amendment, the court declared: ''State legislation applying alike and equally to all aliens, withholding from them the right to own land, cannot be said to be capricious, or to amount to an arbitrary deprivation of liberty or property, or to transgress the due process clause.'' Upon the subject of equal protection the court held that the classification was reasonable, saying that the rule established by Congress on the subject of naturalization ''in and of itself, furnishes a reasonable basis for classification in a state law withholding from aliens the privilege of land ownership as defined in the act.'' The broad basis of the decision is that ''one who is not a citizen and cannot become one lacks an interest in, and the power to effectually work for the welfare of, the state, and, so lacking, the state may rightfully deny him the right to own and lease real estate within its boundaries.'' In another case, the California statute was upheld upon these grounds, with the comment that both acts were within the police power of the respective states. (*Porterfield* v. *Webb*, 263 U.S. 255 [44 S.Ct. 21, 68 L.Ed. 278].) Other federal court cases in which the constitutionality of the Alien Land Law of California has been considered are: *Morrison* v. *California*, 291 U.S. 82 [54 S.Ct. 281, 78 L.Ed. 664] (reversing *People* v. *Morrison*, 218 Cal. 287 [22 P.2d 718], and declaring section 9a of the Alien Land Law unconstitutional) ; *Cockrill* v. *California*, 268 U.S. 258 [45 S.Ct. 490, 69 L.Ed. 944] (sustaining constitutionality of the presumption set forth in section 9, subd. (a), of the Alien Land Law) ; *Frick* v. *Webb*, 263 U.S. 326 [44 S.Ct. 115, 68 L.Ed. 323].

The defendants rely upon *West Virginia State Board of Education* v. *Barnette*, 319 U.S. 624 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674], and *Thomas* v. *Collins*, 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430], for the proposition that modern doctrines of constitutional law extend the protection of the First Amendment and the Fourteenth Amendment to all cases where the Legislature cannot justifiably find a ''clear and present danger'' as a basis for restricting the liberty of the individual. However, Mr. Justice Jackson, speaking for the majority in the first of these cases, clearly distinguished between the test to be used when dealing with fundamental

liberties, which include freedoms of speech, press, assembly, and worship, and other rights. He said: "In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the first become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case." (319 U.S. at p. 639.) And in the more recent case of *Thomas* v. *Collins, supra,* Mr. Justice Rutledge, speaking for the majority, made clear that the "clear and present danger" test will be applied only to those fundamental liberties protected by the First Amendment. (See, also, *Asbury Hospital* v. *Cass County,* 326 U.S. 207 [66 S.Ct. 61, 90 L.Ed. 6]; *California* v. *Thompson,* 313 U.S. 109 [61 S.Ct. 930, 85 L.Ed. 1219]; *Clark* v. *Paul Gray, Inc.,* 306 U.S. 583 [59 S.Ct. 744, 83 L.Ed. 1001]; *Hendrick* v. *Maryland,* 235 U.S. 610 [35 S.Ct. 140, 59 L.Ed. 385]; 33 Cal.L.Rev. 319.)

These cases and the decisions of the United States Supreme Court previously cited, including *Terrace* v. *Thompson, supra,* and *Porterfield* v. *Webb, supra,* limit the test of a "clear and present danger" to fundamental liberties and do not restrict the authority of the state, under its police power, to limit the rights of aliens in regard to real property situated within its borders. It is sufficient if a rational basis is found for the classification. And considering the Alien Land Law in connection with the record now before the court, there is no

evidence that the statute was unconstitutionally applied or administered.

The Legislature of this state has set up eligibility to citizenship as a primary standard, and because the determination of some fact or condition incorporated in this primary standard rests elsewhere than in the Legislature, or this requirement is to be measured by another standard not under the control of the state and which may be subject to change, does not amount to an unconstitutional delegation of legislative authority. (*Ex parte Gerino,* 143 Cal. 412 [77 P. 166, 66 L.R.A. 249]; *In re Lasswell,* 1 Cal.App.2d 183 [36 P.2d 678], and cases cited therein; *People* v. *Goldfogle,* 242 N.Y. 277 [151 N.E. 452].) This court and the United States Supreme Court in the cited cases have held that the use of the phrase, ''ineligible to citizenship'' does not constitute a denial of due process.

The property in question passed to the State of California by reason of deficiencies existing in the ineligible alien, and not in the citizen Oyama. The citizen is not denied any constitutional guarantees because an ineligible alien, for the purpose of evading the Alien Land Law, attempted to pass title to him. It is the deficiency of the alien father and not of the citizen son which is the controlling factor; therefore, any constitutional guarantees to which the citizen Oyama is entitled may not properly be considered, for the deficiency in a person other than himself is the cause for the escheat. Property which the citizen never had he could not lose, and as the land escheated to the state *instanter,* he acquired nothing by the conveyance and the Alien Land Law took nothing from him.

The trial court's findings in regard to the violation of the statute are fully supported by the evidence. The inferences to be drawn from the evidence that the real property was conveyed to the son, thereby putting it beyond the power of the father to deal with the property directly, the father's failure to file the reports required of a guardian, the unexplained failure of the father, or any one of the defendants, to offer himself as a witness, and the presumption created by section 9 of the Alien Land Law, are ample in this regard. Indeed, this evidence convincingly points to the conclusion that the minor son had no interest in the property, his name being used only as a subterfuge for the purpose of evading the Alien Land Law.

■ The defendants also urge that by the 1942 amendment to the Naturalization Act (56 Stats. 182, 8 U.S.C.A. § 1001), permitting the naturalization of every person who honorably served in the armed forces of the United States during the present war, all ineligibility to naturalization based upon race was removed. But the clear purpose of Congress in granting that privilege to those persons who could not otherwise become citizens was to reward military service. Certainly the statute does not make eligible to citizenship every Japanese national, and those who take advantage of its provisions gain that status because of work well done for our country and not by reason of having the qualifications to join its armed forces. Following World War I, the same privilege was extended to Filipinos (40 Stats. 542, 8 U.S.C. § 388) and it was held that the amendment did not eliminate the basic requirements for naturalization; "as to those not possessing such qualifications, the distinction based on color and race was not eliminated." (*Roque Espiritu De La Ysla* v. *United States,* 77 F.2d 988; certiorari denied, 296 U.S. 575 [56 S.Ct. 138, 80 L.Ed. 406].) The statute relied upon by the defendants in the present case has the same effect.

■ Another complete answer to the contention of the defendants in regard to the changes in the requirements for naturalization is that, under the Alien Land Law, in 1934 the land described in the first count of the complaint automatically escheated to the state, and as to the property conveyed by the estate of June Kushino, escheat occurred three years later. Title vested in the state upon these dates, and the later legislation has no effect upon that title.

■ The defendants claim that the present proceeding is barred by the provisions of one or more of the statutes of limitations generally applicable to civil actions. Primarily, this defense is based upon section 312 of the Code of Civil Procedure which provides: "Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute." But the plain meaning of this section is that the particular statutes of limitations which are found in section 315, et seq., of the Code of Civil Procedure may be invoked except as to an action authorized by legislation which includes a provision limiting the time within which it

may be commenced. And the "different limitation" mentioned in section 312 clearly should be construed to include no limitation as to an action commenced under a statute which specifies that time shall not bar the right to invoke its provisions.

The clear and unmistakable purpose of the Alien Land Law at all times since it was enacted by the People as an initiative measure has been to place the ownership of real property in this state beyond the reach of an alien ineligible to citizenship. Not only is such an alien prohibited from acquiring real property, or any interest therein; the statute expressly provides that he shall not possess, enjoy, use, cultivate or occupy land. He may not convey real property, or any interest therein, or have, in whole or in part, the beneficial use of land, and any attempted transfer to an ineligible alien is void as to the state. These provisions are entirely inconsistent with a statute of limitations; they state broad principles of public policy relating to the ownership of land and declare that any conveyance made in violation of the mandate of the People shall be void.

The Legislature of 1945 made this construction certain. It declared: "No statute of limitations shall apply or operate as a bar to any escheat action or proceeding now pending or hereafter commenced pursuant to the provisions" of the Alien Land Law. (§ 8.5.) "The amendment made by this act does not constitute a change in, but is declaratory of, the preexisting law." (Stats. 1945, ch. 1136, § 2.) It is entirely proper for the Legislature to clarify the provisions of a statute in this manner, and for the court to follow that construction. (*Standard Oil Co.* v. *Johnson,* 24 Cal.2d 40, 48 [147 P. 2d 577]; *Union League Club* v. *Johnson,* 18 Cal.2d 275, 278-279 [115 P.2d 425].)

In regard to the special defense of laches, the court found that the action was not barred upon that ground. The record shows that no evidence was presented tending to prove that any injury resulted to the defendants by reason of the lapse of time which occurred before the commencement of the proceeding and the finding is amply justified. (*Alexander* v. *State Capital Co.,* 9 Cal.2d 304, 313 [70 P.2d 619]; *Ballagh* v. *Williams,* 50 Cal.App.2d 10, 13 [122 P.2d 343].)

The judgment is affirmed.

Shenk, J., Spence, J., and Schauer, J., concurred.

TRAYNOR, J.—I concur in the judgment on the ground that the decisions of the United States Supreme Court cited in the main opinion are controlling until such time as they are reexamined and modified by that court.

Appellants' petition for a rehearing was denied November 25, 1946. Carter, J., voted for a rehearing.