[Civ. No. 21179. Second Dist., Div. Two. Dec. 20, 1955.]

VICTOR M. CARTER et al., Appellants, v. LAWRENCE L. ADLER et al., Respondents.

*There are exceptions not applicable here.
†Assigned by Chairman of Judicial Council.

Goodman & Cogen and Benjamin J. Goodman for Appellants.

Kates & Kates, Gerald B. Tannen and Harvey B. Himmel for Respondents.

MOORE, P. J.—From a judgment declaring that the lease to defendants does prevent plaintiffs (landlords of defendants) from conducting a supermarket on an adjoining parcel for the sale of merchandise specified in the lease to be sold exclusively by defendants, plaintiffs appeal.

Respondents' original lease was in writing, executed by Williams and Keeler under date of August 20, 1951, and the land will be referred to herein as Parcel 1. The premises demised to respondents and designated as Units 4, 5, 6, 7, 8, 9, 20, 21, 22 and 23 of a larger parcel of realty were owned by Williams and Keeler and are commonly known as "Valley Market Town" located at 6127 Sepulveda Boulevard, Van Nuys, Los Angeles County. Pertinent passages of the lease are as follows:

"2. USE OF PREMISES: The demised premises shall be used for the purpose of conducting therein: Grocery, Delicatessen,

Meats, Produce, Fish and Poultry, and for no other purpose without the written consent of Lessors.

"It is understood that Lessees have the exclusive rights on Grocery, Delicatessen, Meats,. Produce, Fish and Poultry in Valley Market Town, located at 6127 Sepulveda Boulevard, Van Nuys, City of Los Angeles, County of Los Angeles, State of California. It is understood that the exclusive rights given herein does not forbid any operator in another category of business from handling any product customarily handled in a similar business operated outside of Valley Market Town . . .

"3. RENTAL: Lessees agree to pay Lessors One Thousand ($1,000.00) Dollars per month in advance each month during the term hereof.

"Then, when the gross volume of sales in all departments have reached Fifty Thousand ($50,000.00) Dollars in any month, then the rental shall be one and one-fourth (1¼%) per cent only on the gross sales volume of all departments between the amount of Fifty Thousand ($50,000.00) Dollars and One Hundred Thousand ($100,000.00) Dollars in said month.

"Then, when the gross sales of all departments combined shall have reached One Hundred Thousand ($100,000.00) Dollars in any month there shall be paid a rental of only one (1%) per cent of the combined total gross sales over One Hundred Thousand ($100,000.00) Dollars until a maximum rental of Twenty-Five Hundred ($2,500.00) Dollars per month shall have been reached . . .

"The term 'gross sales' as used in this lease shall mean the total amount of actual gross charges made by Lessees for all merchandise sold and services performed in or from demised premises, whether for cash or other considerations, or on credit, and regardless of collection in payment of such charges. There shall be deducted however, in computing gross sales for each period, the amount of all sales and excise taxes collected from customers during such period and the amounts of any credits or refunds given for merchandise sold on the premises and returned by customers for credit . . .

"It is hereby agreed by both Lessors and Lessees that if the combined gross volume of sales of the Grocery, Delicatessen, Meats, Produce, Fish and Poultry departments, and any other department covered by this lease and operated by Lessees, falls below the sum of Fifty Thousand ($50,000.00) Dollars gross sales for a period of two (2) months, then, and at that time, *Lessors* shall have the right upon giving a thirty (30) day notice in writing to Lessees to cancel and void this

lease and cause to be vacated all property covered by this lease . . .

"6. A plot plan of what is legally considered Valley Market Town, 6127 Sepulveda Boulevard, Van Nuys, City of Los Angeles, County of Los Angeles, State of California, including the parking area, shall be made a part of this lease.

"7. Lessees shall have the right to ingress, egress and appropriate use for themselves, their agents, servants, employees and persons doing business with them, of that portion of Lessors' premises consisting of entrances, streets, sidewalks, rest room and toilet facilities, parking spaces and other areas on Lessors' premises, their agents, servants, employees and persons doing business with them, hereinafter referred to as 'common areas,' located at 6127 Sepulveda Boulevard, Van Nuys, California only, and does not refer or have any bearing upon any other property owned by Lessors and adjoining Valley Market Town.

"It is understood and agreed by Lessees that the demised premises are a portion of larger premises owned by Lessors in which Lessors may conduct their own businesses as well as let or lease other portions thereof to other tenants."

The document was prepared entirely by Williams and Keeler.

In November, 1953, appellants entered the scene. They purchased the entire parcel of ground of which the demised premises are a part. At the same time they acquired all the interest of Williams and Keeler under their lease to respondents. Appellants' plans became ambitious. At the same time of their acquisition of Parcel 1 and the interest of Williams and Keeler in the lease to respondents, appellants acquired a long term lease on a large unimproved parcel of realty from Owen Michel and his wife Louise. It is herein referred to as Parcel 2. It lies immediately to the north of, and is adjacent to Parcel 1. The two parcels adjoin on the west side of Sepulveda Boulevard with a combined frontage of about 842.5 feet and they comprise a total area of 23 acres. Appellants' purpose in acquiring such leasehold was to increase the area of Valley Market Town by the inclusion of both Parcels 1 and 2 and to make the entire area known as 6127 Sepulveda Boulevard, Van Nuys, and to operate the total area under the name of "Valley Market Town" or "Mr. Carter's Market Place."

Pursuant to such purpose, during the latter part of 1953 and continuing through March 1954, appellants published

and circulated advertising matter announcing their new acquisitions and their plans to develop their combined area into one supermarket under a single name to be selected by the public. Also, they engaged respondents in conferences relating to their master plan and displayed their maps and drawings to demonstrate their new scheme for an integrated market center on Parcels 1 and 2. In the course of their conversations, appellants demanded that respondents yield their exclusive rights under the Williams-Keeler lease, in return for which appellants offered to build for respondents a new market building and would promote increased trade by means of competition within Valley Market Town. The negotiations initiated by such conferences continued for a time. At all times, respondents stood firm for some consideration for the waiver of their exclusive rights to sell the merchandise named in their lease within Valley Market Town.

Notwithstanding respondents' refusal to surrender their contractual rights vouchsafed by the original lease, appellants continued to urge their demands while they went forward with the development of their plans for a single integrated market by including both Parcels 1 and 2. Not until after appellants' drive for respondents to give up their exclusive rights had failed did appellants suggest the plan of constructing and operating a market on Parcel 2 and of "breaking" respondents. Promptly following the latter's refusal to grant the concessions demanded, appellants filed the instant action for declaratory relief.

Appellants now attack findings III and IV which are set out *in extenso* in the margin.[1] They now assert that the exclusive rights granted to respondents for the sale of food products were restricted to Parcel 1 and did not apply to

---

[1]Finding III. That plaintiffs' purpose and intention in acquiring leasehold rights in Parcel 2 was to expand said VALLEY MARKET TOWN so that the same would include both Parcel 1 and Parcel 2 and that both parcels would be commonly described by the same street address, to-wit: 6127 Sepulveda Boulevard, Van Nuys, California; that plaintiffs intended to operate said combined area under the name of VALLEY MARKET TOWN or under the name of MR. CARTER'S MARKET PLACE.

Finding IV. That if plaintiffs are permitted to construct and maintain on Parcel 2 a super market for the conduct of a general super market business for the sale of groceries, meats, produce, delicatessen, fish, poultry and other items generally sold in a super market in the greater Los Angeles area, said market will be in competition with defendants' super market and will result in a loss of business to defendants and will be in violation of the exclusive rights granted to defendants by the written lease under which defendants and cross-complainants hold possession.

Parcel 2 which was acquired two years after the date of the Williams-Keeler lease. They contend that since there was no parol evidence of the execution of the last-mentioned lease, the interpretation thereof must be based solely upon the written lease. ▮ However, it was stipulated that in January 1954, Victor Carter exhibited his drawings to various merchants operating in Valley Market Town and told them of his intention to develop the entire 23 acres as a single shopping center. Such drawings were received in evidence as Exhibits A, B, C, D and E.[2] They disclose that the proposed single market area was uniformly referred to as having one address only, to wit, 6127 Sepulveda Boulevard, Van Nuys, California, the address of respondents' market. Further evidence of appellants' intentions is found in Exhibit F, a memorandum announcement dated November 25, 1953, and a contest entry blank dated December 10, 1953. Also, Mr. Carter testified with reference to appellants' purposes in acquiring a lease on Parcel 2 and in purchasing Parcel 1, and that the "Memorandum to all Tenants of Valley Market Town" advising them to pay rentals to Mr. Carter's Market Place was issued by his employee; that he had conversations with respondents with reference to the lifting of the exclusive rights before he had prepared the plans and drawings already in evidence; that he wished to develop a farmer's market type of shopping center; that respondents conferred but would not agree to waive their exclusive rights. Such evidence fully supports finding III. It is not immaterial. It aids in proving that appellants had no respect for their obligation to respondents as pledged in the Williams-Keller lease, to wit, respondents to have exclusive rights to sell the specified merchandise in Valley Market Town, and appellants' obligation to do nothing that might depress the gross sales of respondents and thereby place appellants in a position to cancel the lease. The court was justified by such evidence in finding and concluding that appellants' proposal to erect and operate a super market on Parcel 2 was to put them in a position to reduce the gross sales of respondents below $50,000 monthly and thereby terminate the lease of respondents.

▮ Finding IV is warranted by the evidence. It requires no Newton to compute that a super market operated on Parcel 2 adjacent to respondents' premises, selling the entire line of

[2]Those exhibits are drawings of the proposed plans of the new "Valley Market Town."

produce, meat, poultry, fish and other items sold by respondents in their Valley Market Town, would be in competition with respondents and would reduce the quantum of the latter's sales. Such fact is common knowledge of which judicial notice is taken. (*Lloyd* v. *Murphy,* 25 Cal.2d 48, 53, 54 [153 P.2d 47] ; *Alexander* v. *State Capitol Co.,* 9 Cal.2d 304, 310 [70 P.2d 619].) Of course, it could not be questioned that for appellants to set up a commercial establishment in direct competition with their tenants would be a violation of the good faith pledged when Williams and Keeler granted respondents the exclusive right to sell the specified merchandise in Valley Market Town. The mutual covenants of the lease abhor the very suggestion of such conduct as that proposed by appellants.

There is no merit in appellants' attack upon finding IV in that it declares that their operation of a super market in competition with respondents "will be in violation of the exclusive rights granted to defendants by the written lease." Conceding it to be a conclusion, while the commingling of a conclusion of law with findings is not so artistic as careful draftsmanship might devise, the practice is quite common and should not necessarily cause injustice. (*Levins* v. *Rovegno,* 71 Cal. 273, 278 [12 P. 161] ; *Alkus* v. *Johnson-Pacific Co.,* 80 Cal.App.2d 1, 4 [181 P.2d 72].)

A restrictive covenant, such as the grant of the exclusive mercantile rights to respondents, is not merely ornamental words, inserted to please the eye. It is a living expression of the grantor incorporated in a lease as a consideration for the lessee's faithful performance. Concomitant with such a covenant is the implied obligation of the lessor not to cancel the covenant or derogate from its force by so using his adjoining property as substantially to impair the lessee's enjoyment of the leased premises. (32 Am.Jur., p. 259, par. 276.) Where a lease grants "all the space in a hotel building necessary for the conduct of a restaurant business," the landlord was enjoined from renting any other space in the hotel to a competitor of his lessee. The court was "satisfied from the language of the lease that it was the intention of the parties thereto to demise to the lessee the exclusive right to operate a restaurant in the hotel building." (*Keating* v. *Preston,* 42 Cal.App.2d 110, 122, 123 [108 P.2d 479].) Where a hotel leased the barbershop and manicuring concession for a term of two years, it violated the lease when subsequently it leased for barbershop uses the

front room on the first floor of an adjoining building into which there was direct access from the hotel. (*Belvedere Hotel Co.* v. *Williams,* 137 Md. 665, 671, 673 [113 A. 335, 337, 14 A.L.R. 622].) The court held that the granting of a concession ''in its hotel'' was intended to be a concession of the privilege of the entire hotel and that such concession prohibited the leasing of a competing barbershop, a portion of the hotel building theretofore unused, even though it had a street address different from that of the hotel.

It is generally held that a lease of a portion of a building for specified uses is violated where the lessor subsequently leases to a competitor outside rooms of the same premises (*Schmidt* v. *Hershey,* 154 Md. 302, 305 [140 A. 363, 364]); where the space named in the subsequent lease had been previously excluded from the lease (*Strates* v. *Keniry,* 231 Mass. 426, 429 [121 N.E. 151]); where the hotel built an addition to its building, with a door leading through a common wall, and used the new addition for the sale of liquor and cigars, the exclusive right to which had been granted to another by a prior lease, it was held that the building of the addition ''was a manner of subterfuge to avoid the consequences of the restrictions in the lease. The annex became and is a component part of the hotel building. . . . When the added structure became an integral part of the block, so constructed and designed to be such, the covenant being continuing, should be construed to cover the block in its entirety, in whatever shape it may be, during the life of the lease.'' (*Shaft* v. *Carey,* 107 Wis. 273, 278 [83 N.W. 288, 290].) In a New York case, after the landlord had leased to one Topol certain premises with a covenant that Topol should have the exclusive right there to handle specific lines of business, he leased a store to the corporate defendant, one block away from Topol's location in which the corporation was to conduct a business in competition with Topol. The corporation had knowledge of the restrictive covenant in Topol's lease. The court held that the restrictive covenant in the lease should be broadly construed to effectuate the clear intent of the parties to the lease and would prohibit the lessor from leasing any other store of the lessor in the entire city block. (*Topol* v. *Smoleroff Dev. Corp.,* 264 App.Div. 164 [34 N.Y.S.2d 653, 656].)

In addition to the support of the cited decisions, it will be recalled that the lease at bar was prepared entirely by the original lessors. Under the rule that any uncertainties

in the construction of a lease will be resolved strictly against the lessor who prepared the document (*Bell* v. *Minor*, 88 Cal.App.2d 879, 881 [199 P.2d 718]; *Lori, Ltd.* v. *Wolfe*, 85 Cal.App.2d 54, 65 [192 P.2d 112]), the only reasonable explanation of the presence in the lease of the grant of exclusive rights is that such covenant was bargained for by respondents as a necessary part of their transaction. It is easy to see that if the chancellor had not given a broad construction to the lease by reducing the chances for appellants to cancel the lease on account of the dwindling of respondents' monthly gross sales below $50,000 for two months in succession, a great injustice might easily have befallen respondents. The court properly construed respondents' exclusive rights to sell the specified products in connection with the clause relating to the cancellation. (Civ. Code, § 1641.)

The contention that competition is not an issue is to disregard the presence of the lease as an exhibit. In view of its provision that either party may terminate the lease in the event that the gross amount of sales should be less than $50,000 per month for two consecutive months it cannot be seriously asserted that competition is not an issue. After finding that Parcel 2 would be the situs of appellants' proposed super market and that it adjoins Parcel 1, occupied by respondents under lease of August 20, 1951, the court had judicial knowledge that a super market on Parcel 2 would be a competitor with respondents' market on Parcel 1. In addition, evidence was received to the effect appellants had first declared that if respondents did not give up their exclusive right to sell the products and groceries granted by their lease, appellants "would be forced to build another market in competition" with respondents; that Mr. Carter had said "he knew of somebody that would go into that particular market in competition" with respondents.

It was a reasonable inference from the declarations of appellants that they had a fixed purpose to take over Market Town; to oust respondents by reducing their sales or by some unfair means to deprive respondents of their exclusive rights to sell the food products granted by their lease and that appellants would undertake the erection of a super market on Parcel 2 to compete with respondents and to accomplish their purpose.

It is the law that when a tenant occupies a store under a lease which fixes the rental at a minimum rental or a definite percentage of the gross receipts from sales, he can-

not avoid liability by diverting his business to another store he operates in the same vicinity, when such diversion is effected for the sole purpose of reducing the amount of the gross sales below a specified sum whereby to lay the basis for a cancellation of the lease. ''Such conduct would be a direct violation of the covenant of good faith and fair dealing which exists in every contract.'' (*Goldberg 168-05 Corp.* v. *Levy,* 170 Misc. 292 [9 N.Y.S.2d 304, 305].) A landlord is governed by the same rule. ■ He cannot by any circumlocution or tergiversation avoid the covenant of good faith which attends him in the performance of his obligation to his lessee.

■ Neither lessee nor lessor can avoid liability for damages where they are operating under a percentage rental lease and either conducts a competing business on adjacent premises, causing a reduction of the gross receipts on the demised premises. (*Cissna Loan Co.* v. *Baron,* 149 Wash. 386, 390 [270 P. 1022].) In an Illinois case, the lessee occupied the premises to operate a gasoline filling station at a rental of $1\frac{1}{4}$ cents for every gallon sold. Although the lease made no provision for a minimum rental and made no covenant not to operate a competing station elsewhere, yet after he had acquired the adjoining lot. and by his operations thereon caused his sales on the leased premises to fall only a few gallons per month, the court scorned his behavior and opined that ''the law will not stand by and allow such an evident wrong to be committed without finding some remedy.'' (*Seggebruch* v. *Stosor,* 309 Ill.App. 385, 389 [33 N.E.2d 159].)

■ To be justifiable, competition can be only that which is carried on in good faith, not that by which the wrongful party is seeking to gratify his feeling of chagrin, disappointment or hatred for another. (*Prosser's Law of Torts,* p. 751, 2d ed.) Such competition has no rightful place in the commerce of the modern world: the man on the street abhors it, the publicist stands aghast at it and the courts condemn it. ■ Where lessees have undertaken to conduct an honorable, profitable business on the lands of their lessors, the latter will not be permitted to frustrate the mutual purposes of the parties or drive the lessees from the business world. He will not be applauded for either taking advantage of the lessee while operating fairly on the demised premises or for subsequently acquiring adjacent land and operating a cut-throat competition with his lessee.

The authorities urged by appellants: *Cousins Inv. Co.* v. *Hasting Clothing Co.,* 45 Cal.App.2d 141 [113 P.2d 878];

74

*Masciotra* v. *Harlow,* 105 Cal.App.2d 376 [233 P.2d 586];
*Palm* v. *Mortgage Inv. Co.,* (Tex.Civ.App.) 229 S.W.2d 869;
*Freeport Sulphur Co.* v. *American Sulphur Royalty Co.,*
117 Tex. 439 [6 S.W.2d 1039, 60 A.L.R. 890]; *Hicks* v.
*Whelan Drug Co.,* 131 Cal.App.2d 110 [280 P.2d 104]—are
not helpful. They have to do with the interpretation of per-
centage rental leases which provided for absolute payment òf
substantial minimum rentals, where the right of cancellation
of the lease was not in issue and where the wrongful conduct
of either party in attempting to destroy the lessee's business
would fail to effect complete frustration of the original pur-
poses of the parties.

Judgment affirmed.

Fox, J., and Ashburn, J. pro tem.,* concurred.

A petition for a rehearing was denied January 13, 1956,
and appellants' petition for a hearing by the Supreme Court
was denied February 15, 1956. McComb, J., did not par-
ticipate therein.