PARKER, et al. *v.* THE LEWIS GROCERY COMPANY, et al.

No. 42638          May 20, 1963          153 So. 2d 261

*Watkins & Eager, Henley, Jones & Henley,* Jackson, for appellants.

*Wynn, Hafter, Lake & Tindall,* Greenville; *Cox, Dunn & Clark, Wells, Thomas & Wells,* Jackson, for appellees.

McElroy, J.

The issues here presented for determination are (1) whether the court was correct in holding that a lease was ambiguous, and in permitting parol evidence to be introduced in the determination of the issues involved, and (2) the correct construction of a lease, whether it includes all or only a portion of a piece of land shown to the appellee and referred to as the Maywood

Shopping Center, or Maywood Mart, in the City of Jackson, Mississippi.

The Chancery Court of the First Judicial District of Hinds County, Mississippi, entered a decree awarding to the appellees an injunction prohibiting appellants from leasing, or permitting anyone to use, any portion of buildings or property in what is termed by the appellants as "Brenway Mart", for the purpose of a supermarket during the effective term of the appellees' lease or any renewal or extension of the lease. From this decree appellants make this appeal.

The parties to this appeal are: Appellants, Richard T. Parker, Ruby Boyd Parker, his wife, and Brenway Corporation, organized October 4, 1961, the entire capital stock of which is owned equally by Parker and wife, with their being the sole officers and directors, Parker being President, and his wife being Vice President, Secretary and Treasurer; Appellees, The Lewis Grocer Company, a Mississippi corporation, of which Morris Lewis, Jr. is President, which, as the sole complainant, filed its complaint in chancery court on May 7, 1962, and its wholly owned subsidiary corporations and affiliates, Sunflower Stores, Inc. and Sunflower Stores of Mississippi, Mississippi corporations, which two became co-complainants with their parent corporation, all three of which were referred to in the pleadings as "The Lewis Grocer Company."

The complainant in part states that Richard T. Parker, on March 12, 1956, acquired title from Richard T. Parker and M. A. Lewis, Jr. to, and became the owner of, a block of land composing nearly four acres of ground in the Southeast Quarter of Section Thirteen, Township Six North, Range One East, and during that year Richard T. Parker caused a building, a parking lot and other facilities to be constructed on the described property, all of which facilities were designed and constructed for use by various businesses and com-

mercial enterprises to be located therein and to be operated as a business or shopping center; that the buildings, parking lot and other facilities were constructed solely for the purpose of leasing space to businesses and commercial enterprises, and that the defendant, Richard T. Parker, had leased space in the building and parking lots, which facilities have been named and referred to by the defendant as "Maywood Shopping Center", to various firms, persons or corporations for the purpose of conducting and operating businesses; and Richard T. Parker, as lessor, on August 13, 1956, executed and delivered to the complainant, as lessee, a lease agreement wherein defendant leased and let to the complainant certain premises located in the above-mentioned Maywood Shopping Center which are more particularly described in said lease as follows, to-wit:

"That certain store space located in Maywood Shopping Center upon property owned by Lessor in Southeast Quarter (SE¼), Section 13, Township 6 North, Range 1 East, which said store space consists of approximately 13,600 square feet designated as Store Space Number Three (3) on the plan of Maywood Shopping Center, which said plan has heretofore been approved by both Lessor and Lessee. Said store space being hereinafter referred to as the 'DEMISED PREMISES'."

The complaint further states that the term of the lease is 184 months, commencing September 1, 1956, and ending at midnight, December 31, 1971; that under the provisions of paragraph 8 of the lease the complainant, appellee, is granted the right to conduct a supermarket business on the demised premises, and that the complainant, since the completion of the buildings, has continuously operated and is presently operating a supermarket known as "The Sunflower Store" on the demised premises under the rights granted the com-

plainant by the terms of the lease; that paragraphs 8 and 27 of the lease contain certain covenants restricting use of the demised premises, and also, the use of the remainder of the buildings and premises constituting Maywood Shopping Center. Under the covenant the complainant agreed to use the demised premises for supermarket purposes only, and the defendant, Richard T. Parker, agreed not to use himself, or to lease to any other person, any space in Maywood Shopping Center, or any addition to or extension, for a supermarket.

The complainant agreed to pay for the use of the premises an annual rental amounting to one percent of the aggregate gross annual sales resulting from the supermarket business, or in the event one percent of the sales amounted to less than $10,500, a minimum guaranteed annual rental of $10,500. Complainant would show that according to the agreement and intention of the parties to the lease, the utmost good faith and fair dealings was to be exercised by both parties to maintain a gross annual sales resulting from the supermarket business, and a maximum in order that the percentage rental to be paid under paragraph 2 of the lease would be substantially greater than a minimum guaranteed annual rental and in order to insure that the volume of business enjoyed by the complainant would be sufficient to pay the minimum guaranteed annual rental of $10,500, and, in addition thereto, be a profitable business for complainant. Richard T. Parker is under a duty and obligation to the appellee not to do or perform any act which would decrease the volume of business of the supermarket, thereby causing the appellee not to be able to properly operate the supermarket.

On September 11, 1953, the defendant, Richard T. Parker, together with M. A. Lewis, Jr., Ludwell Pierce, and M. A. Madden and Pauline B. Madden, acquired title and became owners of real property immediately west of and adjacent to the above described tract of

land on which Maywood Shopping Center is presently located. This land is situated in the northeast intersection of U. S. Highway 51 and Northside Drive and the Southeast Quarter of the Southwest Quarter, and the Southwest Quarter of the Southeast Quarter of Section Thirteen, Township Six North, which land consists of about three and a half acres and lies adjacent and west and northwest of the Maywood Center. The Maddens conveyed their interest later to Richard T. Parker and M. A. Lewis, Jr.

On August 13, 1956, when appellant, Richard T. Parker, leased appellee, The Lewis Grocer Company, the land, or was talking about leasing the land in Maywood Shopping Center, and at the time of the execution of the complainants' lease as set forth, the defendant Richard T. Parker stated to and advised the complainants of his desire to expand Maywood Shopping Center, on the adjacent and adjoining property, at some future time, and explained the alleged business benefits to be derived by complainant as a result of the expansion; that during the early part of the year 1961 Richard T. Parker began making plans to construct an addition to the Maywood Shopping Center on the adjoining land, and made plans to lease a portion of the property, the proposed buildings to be constructed on the land, to Jitney Jungle or its affiliates for use as a supermarket. Richard T. Parker advertised in certain newspapers and by other means and informed the President of appellee's (The Lewis Grocer Company) company of his intention to construct an addition to Maywood Shopping Center, using the above described adjacent land for such purpose. Advertisements and representations were to the effect that the addition and expansion was to be an enlargement of the presently existing Maywood Shopping Center, and that the defendant advised that various kinds and types of stores, including a supermarket, would be operated in the additional buildings, all of which

business was to be operated as a part of the Maywood Shopping Center. During the month of June, 1961, Richard Parker, realizing his obligations and duties to the complainant under his lease, contacted the President and requested that he waive and relinquish, on behalf of complainant, its right under the covenants contained in the complainant's lease, this being the first knowledge that complainant had that the proposed building on the adjacent land and the proposed expansion of the Maywood Shopping Center would include space to be used for a supermarket; they had several conferences in reference to this, and, after a thorough study of the matter, on July 20, 1961, by letter, the appellee advised the appellant of its refusal to waive or relinquish its rights or covenants under the lease, and further advised the appellant that the proposed lease to another supermarket would be disastrous to the appellee's business and would cause the appellee to suffer great loss of profit. In spite of the appellee's refusal to waive the covenants contained in its lease, Parker proceeded with his plans and constructed buildings on the property adjoining Maywood Shopping Center, and, in anticipation of the construction of the buildings, on October 10, 1961 the appellant, Parker, conveyed to M. A. Lewis, Jr. his one-half undivided interest in part of the adjoining property. M. A. Lewis, Jr. acquired title to the western part of the property by deed, and on August 21, 1961 M. A. Lewis, Jr. conveyed the property in question to Ruby Parker, the wife of the defendant Parker. This tract consisted of the south seventy feet. On October 10, 1961 M. A. Lewis, Jr. conveyed to Parker his undivided one-half interest in the remaining part of the adjoining property to Maywood Shopping Center, making Parker the owner in fee simple of the property except that part his wife owned of the seventy feet, as of October 10, 1961.

On November 1, 1961, L. C. Pierce leased his land for twenty years to the Deposit Guaranty Bank & Trust Company.

On December 8, 1961 Ruby Parker and Richard Parker leased their land to Brenway Corporation; Brenway Corporation executed a deed of trust to M. A. Lewis as Trustee for the Deposit Guaranty Bank & Trust Company.

The appellee charges on information and belief that then the Deposit Guaranty Bank & Trust Company leased the property to the Brenway Corporation as lessee, with the reason that Parker and Mrs. Parker gave the deed of trust to M. A. Lewis, Jr. as Trustee for the Deposit Guaranty Bank & Trust Company, and that these various deeds and deeds of trust were made in anticipation of the construction by the appellant of the proposed addition to Maywood Shopping Center, and were made according to a prearranged plan conceived by the appellant in an attempt to avoid and evade legal obligations to the appellee arising from the covenants both expressed and implied granted to the appellee in its lease. This was done at a time when the appellants knew that the appellee objected to use of the adjoining property for supermarket purposes, and was made to avoid liability for the breach of the covenants; Brenway Corporation has begun construction of and is presently constructing upon a part of the property adjoining Maywood Shopping Center commercial buildings and parking lots.

Brenway Corporation intends and threatens to lease or has leased part of the space in the proposed buildings to Jitney Jungle, Inc.

Appellees contend that all of the foregoing, by the Parkers and Brenway Corporation, constituted a mere subterfuge on the part of all the defendants to attempt to void their legal obligations under the lease covenants

and provisions, for the sole and only purpose of evading their legal obligations.

On January 6, 1962 the appellees again notified the appellants that it would not waive the right granted them under the lease, and put them on notice of its intention to enforce the covenants if violated. All of this property as described, and the property presently constituting Maywood Shopping Center, is included in and as a part of the land conveyed by the restrictive covenant, notwithstanding the defendant's attempt to remove the adjoining property from the operation of the restrictive covenants, by changing the name of the additional facility to Brenway Mart, and placing the title of the property in the name of Brenway Corporation.

The answer of the defendants, appellants, admitted the lease contract of August 13, 1956, but that "the same is not the complete agreement in that it does not have attached thereto and as a part thereof the plan of Maywood Shopping Center, which plan had been approved by both lessor and lessee prior to and at the time of the execution of the lease agreement"; that the plan of the Maywood Shopping Center which had been approved by both the lessor and lessee prior to the execution of the lease shows clearly and unambiguously that the rights and obligations of the parties were limited and confined to the Maywood Shopping Center as shown on the plan; and that the appellant denies that he agreed not to use himself or lease to any other person any space in or addition to or extension of Maywood Shopping Center as use for a supermarket insofar as the lands beyond the limits and boundaries of the Maywood Shopping Center as shown in the exhibit, and denied that the development of the Brenway Corporation constitutes any addition to or extension of the Maywood Shopping Center; that the plan of the Maywood Shopping Center at the time of execution of the appellee's lease, which said plan is

Exhibit I, or C-30, to the answer of Richard T. Parker, reference to which is made hereby, clearly shows the boundaries of the Maywood Shopping Center; that at the time of the execution of the appellee's lease, there existed definite plans for only six stores within the boundaries of the shopping center, but there were plans for the development of many additional stores within the shopping center; that the location of the proposed future additions were indicated as such on the plan; that since the execution of the lease there have been future additions within Maywood Shopping Center to the extent of nine additional stores, which increased the total number of stores within the center to fifteen; and that the lease also stated: ". . . which said store space consists of approximately 13,600 square feet designated as Store Space Number Three (3) on the plan of Maywood Shopping Center, which said plan has heretofore been approved by both Lessor and Lessee"; that paragraph 8 of the lease provided in part: "Lessor covenants that he will not rent space in Maywood Shopping Center to any other supermarket"; that paragraph 27 provided: "Lessor covenants and agrees that he will not lease any other part of the buildings constituting Maywood Shopping Center to any other person, firm or corporation other than Lessee for use as a supermarket and that Lessor himself will not use any of the space in Maywood Shopping Center for the operation of a supermarket."

The Lewis Grocer Company, the appellee, filed an answer to the answer and cross-bill of the defendant, the appellant. They admitted that the lease agreement was a true and correct copy, but denied that it is only a portion of the lease agreement and avers that Exhibit B, which is the lease, is and was the complete type agreement between the parties; they denied that there was any map, drawing, or plot plan exhibited to the lease which purported to describe, define, or limit the entire

development which was to be known as the Maywood Shopping Center or Maywood Mart; they averred that during the course of negotiation leading up to the signing and execution of the lease involved, there was delivered to the cross-defendant by Richard Parker a set of blueprints setting forth the plans and specifications covering the six stores and the area on which they were to be located and which constituted the first buildings which were to be erected as the initial construction in the Maywood Shopping Center or Maywood Mart; but they admit that its president approved the blueprints as showing and only showing the place in which the appellee's supermarket was to be located, in relation to the five other store buildings and type of construction of the buildings; they denied they approved any plan or blueprint for any purpose which would limit the effect and purport of the restrictive covenants contained in the lease agreement.

The testimony is to the effect that M. A. Lewis, Jr. is a lawyer living in Jackson, Mississippi, and is first cousin of Morris Lewis, Jr., who is the moving force in the Lewis Grocer Company.

M. A. Lewis, Jr. was a close friend, and had been for twelve years, and was a business associate as well as attorney for Richard Parker. He was the one who prepared the first draft of the lease for Parker and continued to act as his attorney, while Oscar Townsend of Indianola acted for the Lewis Grocer Company as attorney. Neither the attorney for Mr. Morris Lewis, Jr., nor Mr. Morris Lewis, Jr. himself, had anything to do with the naming of the shopping center. As to the drawing of a group of six stores for Mr. Richard Parker, this was never seen by Mr. Morris Lewis's attorney, Mr. Townsend.

Morris Lewis, Jr. testified that sometime in 1955 he received several calls from Jackson about a supermarket, and Richard Parker was one of them who

called him. He received one or several telephone calls from M. A. Lewis, Jr. in Jackson advising him that a friend of his named Richard Parker was interested in developing a shopping center outside the city limits north of Jackson. He asked him if he would meet him to see if he was interested in taking a lease on a food store in the shopping center. At that time Mr. Ray Coney was Vice President in charge of his retail operations. Mr. Coney had occasion to be in Jackson, and investigated and came back and told Mr. Lewis that he was not impressed with the location. He met Parker first with Mr. Leroy Paris, who is Vice President of their company. He drove to Jackson and they met Mr. Parker at the proposed site of Maywood Shopping Center. He and Paris were being advised by Mr. Parker of the relation of the property surrounding the area and of the future growth and potential of the particular center. Mr. Parker told them that directly south of the property, the property was zoned in such a way that he didn't believe that commercial development could ever take place, at least there would not be sufficient property for a shopping center there to be in competition with this. He said there was some mix-up in the shopping center south of there. He showed where he proposed to start with six stores, and how he hoped later to develop some additional stores facing Northside Drive, and then he told them that he and Mr. M. A. Lewis, Jr. owned the property north and west of it, and that he actually controlled it, that he had an understanding that he could get it at any time, and that he hoped that he could expand the center there, as his finances would permit and as the area developed, and that someday he would have this larger than Meadowbrook Shopping Center. Parker told them they would have the exclusive right to operate a food store and that the day would come when other supermarkets would want to get into the area, but that they would be there by themselves,

and therefore it would be a lucrative venture for them as the years moved on ahead. He said that he had some people who would probably go into the center when the food store was secured. He mentioned a drug store and possibly a hardware store. There was special emphasis placed on the food store for the shopping center, and it was an absolute necessity. That was in 1955. Later he stopped in and talked to Mr. Parker and they reviewed the same things as they had before. They talked about the exclusive arrangement, and then discussed rental terms, and at that time Mr. Parker told Mr. Lewis that if they would take the center, he would give them an exclusive in it, and again he encouraged him by stating that he hoped to develop it. He was going to try to get the additional property, but if he couldn't, it wouldn't interfere with the extension of this center, because he had access by by-passing the Pierce property if necessary. He stated he hoped someday to get a post office in there. There were a number of things he had planned for the future. Mr. Lewis testified he thought Parker had the blueprints to show where the first six stores would be built. Parker showed him how he proposed to build those six and how he expected to add a few more to it as soon as he could get tenants for them. They all considered that this was just the first two stages of this development. The buildings west and north of the original Maywood Mart are located in the area and on the ground that was pointed out to him by Parker on his two previous conversations, and where he was told he would have the exclusive right to operate a food store. He testified Parker even went so far as to say that when he did develop in years ahead that other companies would want another food store in there, but that Lewis could rest assured that he would have, on an exclusive basis, a very profitable business venture. Lewis said it was after this discussion and on the arrangement of putting

in certain leasehold improvements that he made the decision to operate a food store and take the lease in the Maywood Shopping Center.

Mr. Lewis stated that he had no blueprints and it was unsatisfactory for him to be always calling Mr. Parker about the building, so he had an architect at Greenville, Mr. Harold Kaplan, to make plans for his particular store. The blueprint shows it was drawn on July 3, 1956. He had spent nearly $30,000, according to the blueprint of the building, before he signed the lease contract on August 13, 1956, and before he had even seen the plans (blueprint). He testified at length about losing money up until 1959. In other words, he lost money for three years.

The first time Lewis heard anything about another food supermarket was sometime in 1960, when Mr. Parker called him to discuss the possibility of another food store being incorporated in an addition to Maywood Mart, and asked him if he would agree to it. At that time they had knowledge of the A & P being built across the street, and Lewis said he believed that he wrote Parker and referred to this telephone conversation and told him that they would not agree to building of another food store, because they would already have two in the area. This is verified by Exhibit C-15, which is a letter Mr. Lewis wrote to Mr. Parker.

Mr. Paris's and Mr. Coney's testimony substantiated Mr. Morris Lewis, Jr.'s testimony in reference to Mr. Parker's statements.

The appellant objected to the introduction of parol testimony to vary the written contract, on the ground that the instrument had been signed by the parties, being clear and unambiguous, and is the sole evidence of the contract made, and that any evidence of verbal statements made prior to the execution of the instrument would not be admissible in evidence and would

be in violation of the statute of fraud dealing with real estate.

The court ruled: ''We are now at the crux of this whole lawsuit. We are confronted with a peculiar situation there where a shopping center first existed in the imagination of the parties and then in certain buildings under construction, and admittedly by all sides, other buildings added. Now it is true that we have a very definite legal description, but it is also true that there were lands owned by the parties to this litigation that were not included in the first description in the Bill of Complaint that were owned by the parties before the acquisition of this particular part upon which the Sunflower Food Store is located, and other buildings. The crux of this whole matter is what constitutes Maywood Shopping Center, whether it is six stores, nine stores, twelve stores, fifteen stores, or buildings built on other lands adjacent or near thereto.''

The court in its final opinion stated pertinent parts of the evidence in this case:

''Now by way of background, in 1956 the property North of Northside Drive and between the Old Canton Road and New U. S. Highway 51, (which, as the Court recalls, was in the process of construction at that time), had no commercial establishments located thereon, unless the Tote-Sum Store could be termed one. It was an untested and untried area. Mr. Parker stated that the one indispensable ingredient for a successful shopping center was a supermarket and the next would be a drug store. Other supermarket chains were approached. I believe Mr. W. B. McCarty, Sr. was the officer of Jitney Jungle, Inc. who was approached. Now if Mr. McCarty had been sold on this location he would not have hesitated, as Mr. Parker testified, because he had just built a Jitney Jungle Supermarket in Northwood Shopping Center, which was some distance away from Maywood.

"It was absolutely necessary and imperative that a supermarket be obtained before this shopping center could be gotten off the ground and out of the ground. ...

"It was necessary for Mr. Parker to give the supermarket people a real sales talk on this area. I think that Mr. Parker used rose-colored glasses in expounding and explaining what he had in mind and what he intended to do with reference to the development of this shopping center.

"There are many other shopping centers in and around Jackson. Each of these shopping centers has been greatly added to and expanded, but each still bears its original name, as far as this Court recalls, Mart 51, for instance, Meadowbrook Mart, Northwood Shopping Center, Westland Plaza, and Cook Center.

"This shopping center, Maywood Mart, was quickly expanded from the original six stores in 1956 to fifteen stores now. It is the contention of the Defendants that Exhibit C-30 contains the broad plan which should govern in the case at bar. Exhibit C-30 is composed of eleven sheets prepared in February, 1956, and bears the designation 'Group of six stores for Mr. Richard Parker.' The first sheet is a plot plan and the remaining ten sheets are taken up with details of construction, the foundation plan, the floor plan, the roof framing plan, truss details, the elevations, and other detailed building information and data. All eleven sheets are merely labelled 'Group of six stores for Mr. Richard Parker.' None of these sheets even bear an architect's name. The words 'Maywood Shopping Center' or 'Maywood Mart' do not appear on any of these eleven sheets. There are some long dashes with dots in between on the first sheet only that could indicate some sort of boundaries, but these lines thus formed are not indicated as such. In the opinion of the Court, the primary purpose of these eleven sheets was to furnish detailed construction information. I am sure when Richard Parker went over

these sheets with Morris Lewis, Jr. he very definitely did not say: 'Morris, this is it. I don't propose to add to or expand any further than this.' Would a developer trying to make a sale to a skeptical and doubtful super-market executive and thus secure the one indispensable establishment needed to assure the success of a shopping center so limit and circumscribe his shopping center? I think not. It just goes against the grain to believe that he would. It is against the law of nature as it exists in human beings to expect an anxious and enthusiastic seller to so deal with a doubtful and uncertain purchaser. A good seller doesn't first make a sale and then proceed to fly-blow it and unmake it.

"It is not even contended that the prohibition in Paragraphs 8 and 27 applied only to these original six stores covered by Exhibit C-30.

"Now what do we have in this case at bar? We have a group of stores adjacent, adjoining and contiguous to Maywood Mart. The parking lots are joined. There is easy access from the parking lot of Maywood Mart to the parking lot of so-called Brenway Mart. In fact, in The Emporium's lease it is required that there be free and easy access from the Maywood Mart parking area to the so-called Brenway parking area. . . .

"Now this Paragraph 8 and Paragraph 27 surely were intended by the parties to the lease contract to have some significance and some meaning. Did the parties contemplate that in the future the Defendants, on adjoining and adjacent land already owned largely by them, would attempt to develop a separate shopping center and thereby and therein establish a supermarket approximately 100 yards from the supermarket of The Lewis Grocer Company? It was testified that the other merchants in Maywood Mart (Maywood Shopping Center) had demanded and had gotten in their leases ex-clusive rights as to their particular businesses in May-wood Shopping Center. None of those other businesses

has been duplicated in so-called Brenway Mart. The only one which it is now attempted to duplicate is a supermarket, the one indispensable ingredient for a shopping center.

"This Court must give significance and must give some meaning to these two paragraphs, 8 and 27. They were not empty words, they were not put in just to fill up space in the lease, and they were not put in with the intent or even the remotest thought that another supermarket could or would be established on adjoining property not over 100 yards away.

"This Court feels that at the time the lease contract was executed it was the solemn intent of the parties, as expressed in two different paragraphs of the lease, that the complainant would have the one and only supermarket in and for Maywood Shopping Center, and that the parties intended it to cover anything built or constructed in the future on adjoining and adjacent property largely owned by the Defendants at the very time this lease was executed. As shown by the evidence, the first written plans and architect's drawing were labelled, 'An expansion or Addition to Maywood Shopping Center.' This Court feels that the subsequent actions of the parties speak louder than words and that the intent as shown by these subsequent actions was that this was, first and essentially, an addition or an expansion of Maywood Shopping Center. The two parties to this contract, Mr. Morris Lewis, Jr. for Lewis Grocer Company and Mr. Richard T. Parker for the owners, conferred with each other and discussed the question of whether the exclusive right granted in Paragraphs 8 and 27 would be waived. That was done on several occasions and through correspondence."

We believe that the court was correct in holding that the lease contract in reference to what comprised Maywood Shopping Center is ambiguous.

In no part of subject lease was the term "Maywood Shopping Center" or its interchangeable counterpart, "Maywood Mart", defined or delineated. In no part of any attachment to this lease was "Maywood Shopping Center" thus delineated. Paragraph 1 of the lease, the "lease and let" paragraph, did not attempt to lease or let the whole of Maywood Shopping Center to Lessee, but only "that certain store space located in Maywood Shopping Center upon property owned by Lessor in Southeast Quarter (SE 1/4), Section 13, Township 6 North, Range 1 East, which said store space consists of approximately 13,600 square feet designated as Store Space Number Three (3) on the plan of Maywood Shopping Center, which said plan has heretofore been approved by both Lessor and Lessee." The plan did not purport to be a "plot plan" for an entire or permanently fixed Maywood Shopping Center. To the contrary, it was a "Plot Plan" of a "Group of Six Stores for Mr. Richard Parker," of which Store Space Number Three (3), to be occupied by The Lewis Grocer Company, was one. The primary term of the lease was to expire in 1971, with certain renewal or extension provisions.

If appellants contend that the restrictive covenants involved apply only to the Center, in the condition and with the buildings, when and only when the lease is executed, then the covenants could only apply to a "Group of Six Stores" and not to nine additional stores on said original Maywood Shopping Center thereafter erected. But appellants concede that said covenants apply to the latter nine, as well as the original six, stores.

(Hn 1) As to the coverage or applicability of restrictive covenants in the nature of ancillary restraints, the same are tested or viewed not only presently but *in futuro* for the term of the covenants. Thus it is, that when a court is faced with determining whether or not such covenant is a reasonable or unreasonable restraint of trade, the territorial scope may include reasonable ex-

pectation of expansion. Hood v. Legg, 160 Ga. 620, 128 S.E. 891 (1925); Prame v. Ferrell, 166 F. 702 (6th Cir., Ohio, 1909), cert. den. 215 U.S. 605; C. W. Swingle & Co. v. Reynolds, 140 Neb. 693, 1 N.W. 2d 307 (1941); Schultz v. Johnson, 110 N.J. Eq. 566, 160 A. 379 (1932); Wilson v. Gamble, 180 Miss. 499, 177 So. 363 (1937); and many others.

Carter v. Adler, 291 P. 2d 111 (Cal. App. 1955), reh. den. 1956 (later discussed in detail) provides an illustrative example, wherein the Court held that a restrictive covenant in a lease applied to adjoining property thereafter acquired by Lessor's assignee from a third party or stranger.

(Hn 2) Certainly it can be said that a restrictive covenant of the nature here involved, for the term and territory (Maywood Shopping Center or Maywood Mart, original or as expanded), is reasonable, valid, not against public policy, and hence should be accorded a construction consistent with the intent of the parties. Covenants, as broad or broader as, or more restrictive than, the one here before the Court, have been upheld and enforced by this Court in such cases as: Jackson v. Price, 140 Miss. 249, 105 So. 538 (1925); Plaza Amusement Co. v. Rothenberg, 159 Miss. 800, 131 So. 350 (1930), sug. error overr. 159 Miss. 800 (1931); Kilpatrick v. Twin States Realty Co., 193 Miss. 599, 10 So. 2d 447 (1942); Wilson v. Gamble, 180 Miss. 499, 177 So. 363 (1937), supra; and Donahoe v. Tatum, 134 So. 2d 442 (Miss., 1962). In the shopping center domain, such restrictive covenants are not only customary, but a business necessity. Sturtevant, Restrictive Covenants in Shopping Center Leases, 34 New York Univ. Law Rev. (1959), p. 940.

There is no question raised as to the proper description of Lot 3 comprising the space of the Sunflower Food Store, and the only question of ambiguity is the Maywood Shopping Center referred to in the lease.

Pappadatos v. Market Street Bldg. Corp., 19 P. 2d 517 (Cal.) involves a similar question, which lease provided: "While the lessee is lawfully in possession of the demised premises hereunder, the lessor agrees not to rent any other store on the Market Street frontage of the Marshall Square Building for a candy business." While it does not involve land boundaries, it does involve the ambiguity of the lease in which the respondents were trying to narrow the meaning of the restrictive clause to the manufacture and sale of candy, when the lease did not so state. The lease prohibited the use of any other store "for a candy business." The court stated:

"The scope, purpose, and effect of the lease, of course, must be determined from a consideration of it as a whole rather than by a resort to any individual clause thereof. So construed, the lease must be given such an interpretation as will make it effective in conformity with the intention of the parties; and if its terms are in any way ambiguous or uncertain, it must be interpreted in the sense in which the lessee believed at the time of making it that the lessor understood it; and if different constructions of its clauses may be otherwise equally proper, that construction must be given which will be most favorable to the party in whose favor the clauses in controversy were made. (Quoting Edward Barron Estate Co. v. Waterman, 32 Cal. App. 171, 162 P. 410, 411). . . . . In the present case the lease was drawn by the owner, and obviously, if it were intended to confine the restrictive clause to the use of other stores for the 'manufacture and sale of candy' only, the lease would have been so drawn. Moreover, all of the circumstances leading up to and attending the sale of the business to appellant show clearly that appellant believed that the lease would prevent any competition in that building with the business he was purchasing, and that Robinson likewise so understood it."

(Hn 3) We believe the lease between Richard T. Parker and The Lewis Grocer Co. is clearly ambiguous, and that the court was right in permitting parol testimony as to the surrounding circumstances and the conversations that took place prior to and at the time of making the lease.

As it was early said in Morton v. Jackson, 1 Sm. & M. 494 (1843), ''The testimony in such instances is not introduced to explain, or limit, or vary the deed — — but to point out the subject matter on which it is to operate.'' See also Vinegar Bend Lumber Co. v. Churchwell, 123 Miss. 807, 86 So. 299 (1920); Mixon v. Green, 187 Miss. 343, 193 So. 8 (1940); 68 A.L.R. 40; Sumter Lbr. Co. v. Skipper, 183 Miss. 595, 184 So. 296.

The appellees contend as a matter of law, when the adjoining properties were developed by appellants, there was placed therein the facility which they chose to call ''Brenway Mart'', that the same then became an addition to and hence a part of Maywood Shopping Center and subject to restrictive covenants in appellee's lease, because the subject lease contained percentage of one percent of gross sales with minimum guarantee of $10,500 plus additional taxes per year obligatory during the primary term ending 1971, rental provisions and the parties signatory thereby were bound by reciprocal implied covenants of good faith and fair dealing, equity, though following law, also requires the affirmance of the case.

Shopping centers are of comparatively late vintage. Tremendous outlays of venture capital and risk are required and entailed from the supermarket tenant as well as the developer-landlord. Restrictive covenants in the nature of ancillary and reasonable restraints are absolutely required to induce investors to place a new venture in such untried area. (Hn 4) Hence, restrictive covenants, by modern authority, are deemed not antago-

nistic to the public interest, but, on the contrary, consistent therewith.

(Hn 5) In Carter v. Adler, 291 P. 2d 111 (Cal. App. 1955), reh. den. 1956, action was brought for a judgment declaring that a lease to defendants did not prevent plaintiff from operating a supermarket on adjoining land for the sale of goods specified in the lease to be sold exclusively by defendants. From a judgment declaring that the lease to defendants prevented plaintiffs (landlords of defendants) from conducting a supermarket on such adjoining land, plaintiffs appealed. Defendants' original lease was in writing, executed by Williams and Keeler, as lessors, in 1951, covering land referred to as parcel 1. The premises demised to plaintiffs and designated as units 4, 5, 6, 7, 8, 9, 20, 21, 22, and 23 of a larger parcel were owned by Williams and Keeler and were known as "Valley Market Town", 6127 Sepulveda Boulevard, Van Nuys, California. The lease provided in part as follows:

"2. Use of Premises: The demised premises shall be used for the purpose of conducting therein: Grocery, delicatessen, meats, produce, fish and poultry, and for no other purpose without the written consent of lessors.

"It is understood that Lessees have the exclusive rights on grocery, delicatessen, meats, produce, fish and poultry in Valley Market Town, located at 6127 Sepulveda Boulevard, Van Nuys, City of Los Angeles, County of Los Angeles, State of California.

"3. Rental: Lessees agree to pay Lessors One Thousand ($1,000.00) Dollars per month in advance each month during the term hereof. Then, when the gross volume of sales in all departments have reached fifty thousand ($50,000.00) Dollars in any month, then the rental shall be one and one-fourth (1¼%) per cent only on the gross sales volume of all departments be-

tween the amount of Fifty Thousand Dollars ($50,-
000) and One hundred thousand Dollars ($100,000)
in said month.''

The lease further provided that if the combined gross
volume of sales fell below the sum of $50,000 for a
period of two months, then, at that time, the lessors
should have the right, upon giving a 30-day notice in
writing, to cancel the lease and cause to be vacated all
property covered by the lease. A plot plan of Valley
Market Town was attached to and made a part of the
lease. The lease granted lessees the use of all streets,
sidewalks, or parking spaces, on the premises.

In 1953, two years after the execution of the lease to
defendants-appellees, plaintiffs-appellants purchased the
entire parcel of ground of which the demised premises
were a part. They acquired all the interest of Williams
and Keeler under their lease to defendants. At the
same time of their acquisition of parcel 1, plaintiffs
acquired a long-term lease on an unimproved parcel of
realty from third persons. Said parcel is herein referred
to as parcel 2. Parcel 2 lies immediately north of, and
is adjacent to parcel 1. The two parcels adjoin on the
west side of Sepulveda Boulevard with a combined front-
age of about 842.5 feet and comprise a total area of
23 acres. The plaintiffs' purpose in acquiring the prop-
erty was to increase the area of Valley Market Town
by the inclusion of both parcels 1 and 2, and to operate
the total area under the name of ''Valley Market Town''
or ''Mr. Carter's Market Place.'' The plaintiffs an-
nounced their new acquisitions and plans to develop
parcel 2 and engaged defendants in conference relating
to their master plan, displaying maps to demonstrate
their new scheme for an integrated center. Plaintiffs
demanded that defendants yield their exclusive rights
in return for which plaintiffs offered to build defendants
a new market building and promised to promote in-
creased trade by means of competition within the shop-

ping center. These negotiations continued for some time, but the defendants stood firm for some consideration for the waiver of their exclusive. Plaintiffs continued their demands while proceeding with the development of their plans, and upon defendants' continued refusal to give up their exclusive rights, the plaintiffs filed this action.

On appeal, the Court found the evidence sufficient to show that plaintiffs proposed a single market area and that the findings of facts of the lower Court was supported by substantial evidence. In its opinion, the Court stated:

"The Court was justified by such evidence in finding and concluding that appellants' proposal to erect and operate a supermarket on parcel 2 was to put them in a position to reduce the gross sales of respondents below Fifty thousand Dollars ($50,000) monthly and thereby terminate the lease of respondents.

"Finding IV is warranted by the evidence. It requires no Newton to compute that a supermarket operated on parcel 2 adjacent to respondents' premises, selling the entire line of produce, meat, poultry, fish and other items sold by respondents in their Valley Market Town, would be in competition with respondents and would reduce the quantum of the latter's sales. Such fact is common knowledge of which judicial notice is taken. Lloyd v. Murphy, 25 Cal. 2d 48, 53, 54, 153 P. 2d 47; Alexander v. State Capitol Co., 9 Cal. 2d 304, 310, 70 P. 2d 619. Of course, it could not be questioned that for appellants to set up a commercial establishment in direct competition with their tenants would be a violation of the good faith pledged when Williams and Keeler granted respondents the exclusive right to sell the specified merchandise in Valley Market Town. The mutual covenants of the lease abhor the very suggestion of such conduct as that proposed by appellants."

The Court then discussed the restrictive covenant providing that defendants were to have the exclusive right to operate a supermarket in the shopping center, and the various authorities relating thereto, with regard to the proper construction of such a covenant. In this regard the Court stated:

"A restrictive covenant, such as the grant of the exclusive mercantile rights to respondents, is not merely ornamental words inserted to please the eye. It is a living expression of the grantor incorporated in a lease as a consideration for the leasee's faithful performance. Concomitant with such a covenant is the implied obligation of the lessor not to cancel the covenant or derogate from its force by so using his adjoining property as substantially to impair the lessee's enjoyment of the leased premises. 32 Am. Jur., p. 259, para. 276. Where a lease grants 'all the space in a hotel building necessary for the conduct of a restaurant business', the landlord was enjoined from renting any other space in the hotel to a competitor of his lessee. The court was 'satisfied from the language of the lease that it was the intention of the parties thereto to demise to the lessee the exclusive right to operate a restaurant in the hotel building.' Keating v. Preston, 42 Cal. App. 2d 110, 122, 123, 108 P. 2d 479, 485. Where a hotel leased the barbershop and manicuring concessions for a term of two years, it violated the lease when subsequently it leased for barbershop uses the front room on the first floor of an adjoining building into which there was direct access from the hotel. Belvedere Hotel Co. v. Williams, 137 Md. 665, 671, 673, 113 A. 335, 337, 14 A.L.R. 622. The Court held that the granting of a concession 'in its hotel' was intended to be a concession of the privilege of the entire hotel and that such concession prohibited the leasing to a competing barbershop a portion of the hotel building theretofore unused, even though it had a street address different from that of the hotel.

"It is generally held that a lease of a portion of a building for specified uses is violated where the lessor subsequently leases to a competitor outside rooms of the same premises, Schmidt v. Hershey, 154 Md. 302, 305, 140 A. 363, 364; where the space named in the subsequent lease had been previously excluded from the lease, Strates v. Keniry, 231 Mass. 426, 429, 121 N.E. 151; where the hotel built an addition to its building, with a door leading through a common wall, and used the new addition for the sale of liquor and cigars, the exclusive right to which had been granted to another by a prior lease, it was held that the building of the addition 'was a mere subterfuge to avoid the consequences of the restrictions in the leases. The annex became and is a component part of the hotel building. . . . When the added structure became an integral part of the block, so constructed and designed to be such, the covenant, being continuing, should be construed to cover the block in its entirety, in whatever shape it may be, during the life of the lease.' Shaft v. Carey, 107 Wis. 273, 278, 83 N.W. 288, 290. In a New York case, after the landlord had leased to one Topol certain premises with a covenant that Topol should have the exclusive right there to handle specific lines of business, he leased a store to the corporate defendant, one block away from Topol's location in which the corporation was to conduct a business in competition with Topol. The corporation had knowledge of the restrictive covenant in Topol's lease. The court held that the restrictive covenant in the lease should be broadly construed to effectuate the clear intent of the parties to the lease and would prohibit the lessor from leasing any other store of the lessor in the entire city block. Topol v. Smoleroff Development Corporation, 264 App. Div. 164, 34 N.Y.S. 2d 653, 656." Cf. Slice v. Carozza Properties, 137 A. 2d 687 (Md. 1958); Daitch Crystal Dairies, Inc.

v. Neisloss, 185 N.Y.S. 2d 188, affirmed 8 A.D. 2d 965, 190 N.Y.S. 2d 737, and affirmed 167 N.E. 2d 643 (1959).

There is always involved in such leases the covenant of good faith and fair dealings. The Court, in Carter v. Adler, 291 P. 2d 111, supra, stated:

"It is the law that when a tenant occupies a store under a lease which fixes the rental at a minimum rental or a definite percentage of the gross receipts from sales, he cannot avoid liability by diverting his business to another store he operates in the same vicinity, when such diversion is effected for the sole purpose of reducing the amount of the gross sales below a specified sum whereby to lay the basis for a cancellation of the lease. 'Such conduct would be in direct violation of the covenant of good faith and fair dealing which exists in every contract.' Goldberg 168-05, Corporation v. Levy, 170 Misc. 292, 9 N.Y.S. 2d 304, 305, 306. A landlord is governed by the same rule. He cannot by any circumlocution or tergiversation avoid the covenant of good faith which attends him in the performance of his obligations to his lessee. Neither lessee nor lessor can evoid liability for damages where they are operating under a percentage rental lease and either conducts a competing business on adjacent premises, causing a reduction of the gross receipts on the demised premises. Cissna Loan Co. v. Baron, 149 Wash. 386, 390, 270 P. 1022. In an Illinois case, the lessee occupied the premises to operate a gasoline filling station at a rental of 1¼ cents for every gallon sold. Although the lease made no provision for a minimum rental and made no covenant not to operate a competing station elsewhere, yet after he had acquired the adjoining lot, and by his operations thereon caused his sales on the leased premises to fall only a few gallons per month, the court scorned his behavior and opined that 'the law will not stand by and allow such an evident wrong to be committed

without finding some remedy.' Seggebruch v. Stosor, 309 Ill. App. 385, 389, 33 N.E. 2d 159, 160.

"To be justifiable, competition can be only that which is carried on in good faith, not that by which the wrongful party is seeking to gratify his feeling of chagrin, disappointment or hatred for another. Prosser's Law of Torts, p. 751, 2d Edition. Such competition has no rightful place in the commerce of the modern world; that man on the street abhors it, the publicist stands aghast at it and the courts condemn it. Where lessees have undertaken to conduct an honorable, profitable business on the lands of their lessor, the latter will not be permitted to frustrate the mutual purposes of the parties or drive the lessees from the business world. He will not be applauded for either taking advantage of the lessee while operating fairly on the demised premises or for subsequently acquiring adjacent land and operating a cut-throat competition with his lessee."

New York and California do not stand alone among the jurisdictions following the rule that there is a duty of good faith and fair dealing between both lessor and lessee. The question of good faith was discussed by this Court in Risk v. Risher (1944), 197 Miss. 155, 19 So. 2d 484, wherein Mrs. Risher, the appellee, sought to impress a trust for her benefit upon a rental contract made by Mrs. Risk, as lessor, and Mr. Hart, as lessee, covering certain property in Hattiesburg. When the Risk-Hart lease was executed, there was an existing lease on the premises made by Mrs. Risk as lessor to Mrs. Risher as lessee, and Mr. Hart was in possession of part of the premises as sub-tenant under Mrs. Risher. It was the contention of Mrs. Risher that the provisions of her contract with Hart precluded him from securing a lease from Mrs. Risk and ousting her from the premises, and that the lease he obtained from Mrs. Risk inured to her benefit. On the other hand, the appellants contended that the relation between Mrs. Risher and

Hart was merely that of landlord and tenant and that Hart had the right to obtain the lease from Mrs. Risk for his own benefit. It appeared that although the Risk-Hart contract had existed for more than a year, and Hart had been in possession of his part of the premises, adjoining those occupied by Mrs. Risher, during that time as sub-tenant of Mrs. Risher, neither Mrs. Risk nor Hart had informed Mrs. Risher of the agreement. The Court stated that the question was whether or not this situation created a semi-fiduciary relation between Mrs. Risher and Mr. Hart. The court below held that it did, and this Court, on appeal, agreed, as we next observe.

The Court first stated that the mere relation of landlord and tenant alone was not such a relationship, and that something more was needed to impose a fiduciary relation. The Court then stated:

"But, on the other hand, the relation is not restricted to such confined relations as trustee and beneficiary, partners, principal and agent, guardian and ward, managing directors and corporation, etc. Davis v. Hamlin, 108 Ill. 39, 48 Am. Rep. 541; Cushing v. Danforth, 76 Me. 114; 32 Am. Jur., 835, sec. 991; Probst v. Hughes, 143 Okl. 11, 286 P. 875, 878, 69 A.L.R. 929. *It applies to all persons who occupy a position out of which the duty of good faith ought in equity and good conscience to arise.* 'It is the nature of the relation which is to be regarded, and not the designation of the one filling the relation.' . . . In 32 Am. Jur., supra, it is said, 'The doctrine of implied trusts arising out of renewals applies to fiduciaries of practically every description,' and 'It has been said broadly that no one who is in possession of a lease or a particular interest in a lease which is affected with any sort of equity in behalf of third persons can renew the same for his own use only, but such renewal must be construed as a graft upon the old stock.' In Trice v. Comstock, 8 Cir., 121 F. 620, 61 L.R.A. 176,

57 C.C.A. 646, the Court said: '*Wherever one person is placed in such a relation to another by the act or consent of that other, or by the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is in such a fiduciary relation with him that he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated.*' '' See also Senter v. Propst, 190 Miss. 190, 197 So. 100 (1940).

**(Hn 6)** We feel that the court was eminently correct in ordering that an injunction issue restraining the appellants from leasing to any other supermarket in violation of their lease contract. The case is therefore affirmed.

Affirmed.

*Lee, P. J., and Kyle, Rodgers, and Jones, JJ.,* concur.