THORNTON BROTHERS, INC. *v.* GORE

No. 43358          March 1, 1965          172 So. 2d 425

*J. E. Skinner,* Jackson, for appellant.

*W. E. Gore, Jr.,* Jackson, for appellee.

Lee, C. J.

The original bill of complaint in this case charged the following facts: The Thorntons entered into a contract with John E. Gore, Jr., to lease a brick building, just out of the corporate limits of the City of Jackson, on Highway 80 between Jackson and Clinton for a drug store at a rental of $125 per month. The lease began February 1, 1955, and ran to January 31, 1960. The new lease, or renewal, was entered into for the period from February 1, 1960 to January 31, 1965 for a monthly rental of $150. In March 1962, Gore complained that White's Auto Store, a business in the same shopping center, was selling products in competition with his business, that he asked the Thorntons for an exclusive right to sell drugs and sundry articles; and that they signed the same, as shown in an exhibit thereto.

They further charged that, during April 1963, Gore advised them that he was erecting a building and intended to move his drug store to that location, and that he did so move the same in September 1963 to that location, between one-quarter and one-half of a mile away. They charged that Gore was claiming that the supplemental lease was valid and subsisting. On the contrary, they alleged that it was void and cast a cloud on their title, and they wished this cloud to be cancelled. They also alleged that the agreement was without consideration; that it was contrary to public policy; and

that Gore had abandoned their property. The prayer of the bill sought a cancellation of the supplemental lease and an injunction to restrain Gore from interfering with their right to utilize such property as they desired.

The answer and cross bill by defendant and cross-complainant Gore admitted a number of the allegations of the bill of complaint, and stated that White's Auto Store had violated his right in the sale of drug products and accessories to a drug store. He charged that this business was also sold by the then operators of that store to one of the Thorntons. He charged that he and the Thorntons originally entered into a contract and orally agreed that no one else would be permitted to compete with him; that after an incident in March 1962, he requested the Thorntons to reduce to writing the agreement under which they had been operating throughout the period of his occupancy; that the complainants executed the supplemental agreement set out in their exhibit in paragraph 10 of the bill; and that the agreement was a mere continuation of their oral agreement of January 24, 1955. He denied that he was opening a new drug store one-quarter of a mile away, but said that he was still operating at his old location. He denied that he had closed that business but still had approximately $6,000 worth of stock in the building; and that he had paid promptly all rent as it came due. He further alleged that the supplemental lease was valid, subsisting and binding. The instrument contained an exclusive right against the sale of drugs, sundries, and all other merchandise normally sold in a drug store, and was dated January 24, 1955.

By way of cross bill, Gore reiterated the history of the mutual transactions between himself and the Thorntons, who, at the time of the original transaction, were brothers and business partners; and that, although several years after the original transaction in 1955, the

brothers formed a corporation, composed of themselves and their respective wives, and they were the principal officers of the corporation and continued to own the property. He reiterated the details, constituting a violation of the agreement, which assured him freedom from competition in this area. He also charged that the Thorntons promised to stop the competition, but did not do so; and that, in an effort to prevent the misunderstanding and carry out their real understanding, the Thorntons agreed to and did execute the supplemental lease. But he charged that they have been negotiating to lease his rented store to another — one Leo Moore. Consequently, the prayer of his cross bill was that the court enjoin the Thorntons from leasing the building which he was still occupying and on which he was paying rent.

It was admitted that Gore had paid promptly the rental of $150 per month. The parties stipulated that the supplemental lease was dated and signed January 24, 1955. C. D. Thornton said that he and his brother signed the instrument ''to keep harmony''; and that they ''wanted all satisfied''. He admitted that he did promise to see the offending party, and did so, but said that this man showed him that he was selling only six small items, like shaving lotion, shaving cream, etc. On the question as to what had been the agreement between the parties, his evidence was as follows:

Q. . . . After you made your talk down there with Mr. Pickler, (operating White's Auto Store) it was then a couple of weeks later that you signed that agreement? A. Something like that. Yeah, I thought it was all settled, everybody satisfied.

Q. Well, in other words, it was agreeable with you, I take it, for Mr. Gore to have exclusive rights to sell drug store products there?

A.   Because I thought everything was satisfied, and he give no reason for leaving, I thought he would be there.

Q.   I understand that, but it was agreeable with you for him to have exclusive rights to sell drug store products.

A.   As long — as long as he had a store there.

Q.   And that was true from the time he first opened up, wasn't it?

A.   That's right.

Q.   That's right, in other words, when he first came in there, it was under the agreement that he had —

A.   No, there was no agreement at all.

Q.   No agreement, but an understanding that he was going to sell drug store —

A.   Drug store items, that's right.

Q.   — items, and he would be protected —

A.   Yeah.

Q.   — and that was from February, 1955 until the day he moved out?

A.   That's right.''

Gore's evidence, in detail, related the history of the business association between the parties and substantiated the denials of his answer and the allegations of his cross bill.

In his opinion, the learned chancellor, among other things, held as follows:

''Now, it's true that this supplemental agreement does not recite a consideration, and it is not a new agreement but merely reduced a verbal agreement which was not void but voidable to writing, covering the terms of the lease of '55 and the lease of '60, and the consideration which moved the parties to enter into the lease contract is the consideration for the oral agreement which was later reduced to writing, and I am going to hold as a matter of law that the agreement of 1962 was a valid agreement and enforceable, but I also hold

as a matter of law that that agreement dies with the lease on — I believe it was January the 31st, 1965.''

The decree dismissed the original bill of complaint and granted the relief prayed for in the cross bill. It is from that action that the Thorntons appealed.

Appellee's position is that the agreement, while reduced to writing in 1962, actually represented an agreement that was made in 1955. Here was the situation: Gore was in the drug business. The Thorntons were eager to get lessees for the building through which they expected to develop a shopping center. To accomplish this purpose, it was important to have a drug store therein — actually a necessity. Naturally Gore would not, and did not, expect his landlord to afford a competitor for him in that area. There had been no competition from any other lessee since the commencement of operation. When such developed in 1962, he immediately sought to get it remedied. The Thorntons were anxious to keep their tenant. They promised him that they would stop that competition. They at least led Gore to believe that they had done so. ''To keep harmony'' they executed the supplemental lease, reciting that it was effective as of 1955, and C. D. Thornton testified that such understanding and agreement existed from the beginning. That question was an issue in the pleadings. The chancellor found that the understanding did exist from the outset.

37 C.J.S. *Frauds, Statute of* section 171(a), pp. 647-8 (1943), is in part as follows: ''The *memorandum* of the contract required by the statute of frauds *may be made subsequently to the making of the contract itself, and at any time before an action is brought on the contract.* This is especially true where the writing is dated as of the time of the contract, although a writing otherwise sufficient to comply with the statute is none the less valid for want of a date.

"It is held that the memorandum may be made at any period of the performance of the contract, . . .

"In general, the *memorandum must be in existence at the time when action is brought. . .*" (Emphasis supplied).

■■■ The above rule has been adopted by this Court in Ludke Electric Co. v. Vicksburg Towing Co., 240 Miss. 495, 127 So. 2d 851 (1961), where, at page 502 thereof, the opinion used the following statement: "The requirement of the Statute of Frauds is met, when a written memorandum has been made by the party to be charged at any time before the action is brought." In 17 C.J.S. *Contracts* section 61, p. 731 (1963), it is said: "So, as between the parties, it is usually immaterial that the contract is not executed on the day of its date; and it is competent for the parties to agree that the contract shall take effect as of a date earlier than that on which it is executed." See also 49 Am. Jur., *Statute of Frauds* sections 316-7, pp. 630-2 (1943).

Appellants say that there was no consideration for the supplemental lease.

On that question, 17 C.J.S., *Contracts* section 71, pp. 753-4 (1963), states: "No special consideration need be singled out or apportioned for each separate provision in a contract and a number of agreements covering more than one subject may be founded on one consideration. In other words, a single consideration may support several counter-promises made by the other party to the transaction. While the consideration for one contract will not support a distinct and independent contract, *where two instruments are executed as part of the same transaction, the benefit accruing to one of the parties in one instrument may be the consideration for the promise of such party in the other,* as discussed infra § 78." (Emphasis supplied). The same principle is announced in Section 78 *Ibid.*, pp. 766-7, adding only: "When *so intended, an agreement with one person may*

*constitute consideration for an agreement with another."*
(Emphasis supplied).

This Court in Ogle v. Durley, 223 Miss. 32, 77 So. 2d 688 (1955), at page 43, made this statement: "The lease was for a valuable and substantial consideration. The law will not weigh the quantum of the consideration in a contract, and so long as it is something of real value in the eyes of the law it is sufficient." Citing 17 C.J.S. *Contracts* section 127 (1963).

The Court holds that there were good and sufficient considerations to the parties for the execution of the supplemental contract.

■■ The appellants urge that parol evidence cannot be permitted to alter a written instrument. Of course, this may be done to show the effective date of the instrument. See 20 Am. Jur. *Evidence* section 1118, p. 977-8 (1939). But for such rule, appellants could not even deny that January 24, 1955 was the date of the supplemental lease. See Southern Pipe & Supply Co. v. Joseph, 234 Miss. 80, 105 So. 2d 485 (1958); Webb v. Mobile & Ohio R. Co., 105 Miss. 175, 62 So. 168 (1913). Consequently, this contention is untenable.

■■ The appellants contend that the covenant in the supplemental lease constituted an unlawful restraint of trade.

Actually the case of Parker v. The Lewis Grocer Co., 246 Miss. 873, 153 So. 2d 261 (1963), has foreclosed that question. There the inquiry was whether a restrictive covenant, in that instance a shopping center, was antagonistic to the public interest. It was shown that the covenants were reasonable and in the fourth syllabus, which correctly deduced the meaning of the decision, it is said: "Restrictive covenants with respect to shopping centers are not antagonistic to public interest, but are consistent therewith." Consequently, this contention by the appellants must be rejected.

In addition to what has already been said, it must be remembered that there was no provision in the lease, under which appellants were authorized to declare, in this instance, a forfeiture. There is no dispute that all rent had been promptly paid.

The Court is of the opinion that the learned chancellor was correct in his finding and that the decree should be affirmed.

Affirmed.

*Ethridge, Rodgers, Jones and Patterson, JJ.,* concur.